```
 1                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF VIRGINIA
 2                            Abingdon Division

 3

 4
     - - - - - - - - - - - - - - - - - -
 5                                      )
        THE CITY OF BRISTOL, TENNESSEE  )
 6                                      )
                       Plaintiff,       )    CIVIL ACTION NO.
 7                                      )    1:22cv23
        v.                              )
 8                                      )
        THE CITY OF BRISTOL, VIRGINIA   )
 9                                      )
                       Defendant        )
10   - - - - - - - - - - - - - - - - - -

11

12                      TRANSCRIPT OF PROCEEDINGS

13                          (Motion Hearing)

14                         Abingdon, Virginia

15                          August 25, 2022

16

17   BEFORE:  THE HONORABLE JAMES P. JONES
              Senior United States District Judge
18            Western District of Virginia

19

     APPEARANCES:
20

     For the Plaintiff:
21
                 MICHAEL EDWARD LACY, ESQ.
22               ANDREA WEST WORTZEL, ESQ.
                 Troutman, Pepper, Hamilton, Sanders, LLP
23               1001 Haxall Point, Suite 1500
                 Richmond, VA  23219
24               804.697.1406
                 michael.lacy@troutman.com
25               andrea.wortzel@troutman.com
```

1

Appearances (Continued):

2

3          **ERWIN LYNN DOUGHERTY, ESQ.**
           E. Lynn Dougherty, Attorney at Law
           131 Eighth Street
4          Bristol, TN  37620
           423.764.1313
5          dougherty@eldlaw.com

6    Counsel for Defendant:

7          **ERIN B. ASHWELL, ESQ.**
           **JUSTIN DAVID HOWARD, ESQ.**
8          **JOHN DONLEY ADAMS, ESQ.**
           McGuire Woods, LLP
9          800 East Canal Street
           Richmond, VA  23219
10         eashwell@mcguirewoods.com
           jhoward@mcguirewoods.com
11         jadams@mcguirewoods.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            I N D E X

2     DEFENDANT'S
      WITNESSES                                              PAGE
3
        Randall Eads
4             Direct Examination By Ms. Ashwell                26
              Cross-Examination By Mr. Lacy                    60
5

6
      PLAINTIFF'S
7     WITNESSES                                              PAGE

8       Michael Williams
              Direct Examination by Mr. Lacy                  80
9             Cross-Examination by Ms. Ashwell               101

10

11

12                         E X H I B I T S

13    DEFENDANT'S
      NO.             DESCRIPTION                            PAGE
14
        1             Letter from M & W Drilling              21
15
        2             Email from Randall Eads                 36
16

17

18

19

20

21

22

23

24

25

```
 1              (Proceedings commenced at 2:30 p.m.)

 2              THE COURT:  Good afternoon ladies and gentlemen.

 3    The clerk will call the case.

 4              THE CLERK:  The City of Bristol, Tennessee v. The

 5    City of Bristol, Virginia, civil docket number 1:22cv23.

 6              THE COURT:  We're here this afternoon on the motion

 7    of the defendant, the City of Bristol, Virginia, to extend

 8    certain deadlines set forth in the Court's prior preliminary

 9    injunction order entered June 14th.

10              I, of course, read the record.  The plaintiff, City

11    of Bristol, Tennessee, has filed an opposition, which I've

12    had an opportunity to look over.  I think it was just

13    recently filed today.  But I'll hear from the defendant, City

14    of Bristol, Virginia.

15              MR. HOWARD:  Thank you, Your Honor.

16              THE COURT:  Just in terms of our procedure, anyone

17    speaking can remove their mask.

18              MR. HOWARD:  Okay.  Thank you, Your Honor.

19              Your Honor, it's not my intention to argue our

20    motion today.  Since we've not been involved in the case, I

21    wanted the opportunity to introduce myself and our team.

22              If it please the Court, since we have not been at

23    the prior status conference, we've read the transcript from

24    it, but we weren't there and have not had the background that

25    Your Honor and opposing have in this case.
```

1              If it please the Court, I'd like to take you through

2    just a brief background of what we know in terms of where we

3    are in the case, and then when we get to the specific motion,

4    my partner, Erin Ashwell, will be arguing on behalf of our

5    client.

6              THE COURT:  All right.  That's fine.  If counsel

7    would come to the lectern here, that would be helpful.  You

8    may proceed.

9              MR. HOWARD:  First of all, Your Honor, again, my

10   name is Justin Howard.  My partners Erin Ashwell and John

11   Adams are also present from McGuire Woods in Richmond.  We

12   also have with us Randall Eads.  Randy is the city manager

13   and city attorney, as Your Honor knows from past experience

14   in prior hearings.

15             We just recently got involved in this case, as you

16   know.  We reached out to opposing counsel to introduce

17   ourselves and sought an extension of time to answer.  We did

18   not need the entire 30 days that were granted to us, so we

19   answered promptly.  When we were ready to answer, we answered

20   and filed our motion to dismiss answer to the lengthy

21   complaint, and we also filed the instant motion, the one that

22   brings us all here today.

23             One of the first things we did was go out and visit

24   the landfill to see for ourselves what this problem is, and

25   we did that.  I took some photographs while I was there at

 1    the landfill that can sort of just for demonstrative purposes

 2    illustrate how we see this thing and where we are.

 3            The solid waste management facility at Bristol,

 4    Virginia, has been in operation for a number of years.  There

 5    are three landfills at that location.  Landfill 221 began in,

 6    I believe it was 1977, and operated until 1986.  Landfill 498

 7    I believe began in 1986 and operated until, I believe it was

 8    1998.

 9            MR. EADS:  2002.

10            MR. HOWARD:  2002.  Then, of course, landfill 588,

11    the landfill that we are here about today, began in 1998 and

12    has been active up until the present, and is actually still

13    accepting trash while the transition is made to another

14    facility, so that as of September 9th no more trash will be

15    accepted there.

16            THE COURT:  I understand -- it's not entirely

17    pertinent, of course, to today's proceeding, but I understand

18    there has not been a determination of where the trash is to

19    go.

20            MR. HOWARD:  Your Honor, my understanding is that it

21    has been worked out.

22            MR. EADS:  No.

23            MR. HOWARD:  No?  Okay.  Mr. Eads is here, and he

24    can testify more about the specifics, but it's my

25    understanding that we will, or our client will stop accepting

1    trash on September 9th as scheduled.

2           THE COURT:  I know that's understood, but I

3    understood that there hadn't been a determination of exactly

4    where it was going to go, but I'll be glad to hear about

5    that.

6           MR. HOWARD:  Sure.  Yes, Your Honor.

7           Landfill 221 and landfill 498 were operated by the

8    city just like landfill 588 is today.  Landfill 221 has

9    permanent cover, but landfill 498 doesn't.

10          Landfill 1 and landfill 2 have not been the odor

11   problem.  All landfills can generate odor, obviously, but

12   this is something different than normal landfill odor, and I

13   think everyone agrees that it is a problem.

14          Landfill 588 is unique, though, in that it was built

15   in a rock quarry.  This is a photograph of the rock quarry

16   when it was prepped to accept refuse, and you can see how

17   deep the rock quarry was.

18          If you look at it side by side from the most recent

19   Google maps image of the landfill, you can see that it is

20   largely filled.  Now, the satellite image is a little bit

21   deceptive because you can't see how deep the walls are on the

22   sides, but if you are down in the landfill, you can see that

23   above the top of the refuse pile there are significant cliffs

24   all the way around it as is evident in the photograph here.

25          Now, for many years this landfill was not an odor

1   problem other than the normal odor that comes from a

2   landfill.  The current problem that this is all about began

3   in, as I understand it, late 2020, and it became a real

4   problem then.

5          In prior years there were times in the fall when it

6   got cooler there would be a noticeable odor that was

7   different than normal landfill odor, but it wasn't a

8   sustained kind of thing, and it wasn't a significant problem

9   that drove all of the public outcry and all the complaints

10  until 2020, as I understand it, Your Honor.

11         In January of 2021, Bristol, Virginia, wrote to DEQ

12  asking for their assistance, and to EPA asking for their

13  assistance in dealing with this unique problem.

14         One thing to point out is that the landfill,

15  landfill 588 that we're here about, is only a thousand feet

16  from the Tennessee border.  The Tennessee line is visible

17  from that aerial photograph you can see there, Your Honor.

18         When these increased complaints started, Bristol,

19  Virginia, invested $1.1 million in more than doubling the gas

20  wells on the landfill.  What those do is relieve those gases

21  that are causing the odor.

22         That gas is then collected and burned for

23  electricity, or if the power company that's accepting that

24  electricity is not producing electricity and it needs to be

25  disposed of, it's burned in a flare, which is just like it

1    sounds, a large flare.

2           Since the additional gas wells have been installed,

3    it has substantially improved the situation, but it has not

4    eliminated it.  It is a significant odor problem, and no one

5    would dispute that.

6           In this photograph here you can see from inside the

7    landfill one of the gas wells.  There is another one here.

8    You can see the liner around the perimeter of the landfill.

9           What is unique about this landfill that is different

10   than the prior two is that it is in a rock quarry.  It is

11   essentially a granite bowl, a water bowl, that collects all

12   of this rain, and it has to be pumped off, but this

13   additional moisture causes all of the decomposing refuse to

14   generate a lot more gases, I believe, than a standard or a

15   normal landfill in a different geologic configuration.

16          So that, I think, is what is unique here.  If you

17   look around the country, the other places where they've done

18   landfills in rock quarries, they're experiencing the same

19   kinds of issues.

20          Now, in this photograph here you can see another one

21   of these gas wells.  I'm going to go ahead and switch

22   connections here.  For some reason it is not responding.

23          Your Honor, the landfill's unique problem is that

24   it's in this rock quarry, and it poses some unique

25   challenges.  This is a unique challenge that requires custom

 1    solutions.

 2           The City of Bristol, Virginia, has been hopeful that

 3    all of this controversy could be resolved amicably with

 4    Bristol, Tennessee.  The letter to DEQ requesting assistance

 5    went out in January.  In April DEQ issued its expert panel

 6    report, and this lawsuit was filed shortly thereafter.

 7           We reached out during our first consultation with

 8    opposing counsel when we introduced ourselves, our whole team

 9    to their whole team, and we proposed mediation, that we sit

10    down all of the lawyers and all of the decision makers from

11    both Bristol, Tennessee, and Bristol, Virginia, with our

12    experts to try to come up with a solution cooperatively.

13           From our perspective, this litigation makes no

14    sense.  You have essentially one community divided down the

15    middle by State Street fighting each other with big law firms

16    at taxpayer expense on both sides.  We don't believe that

17    that's the appropriate course.

18           THE COURT:  Let me interrupt you there.  I don't

19    disagree with you that it's a shame that it's come to this,

20    but, you know, your client agreed to this preliminary

21    injunction and the dates therein.

22           They're adults.  They had legal counsel.  I mean,

23    aren't we sort of backing up on their decision making in what

24    you say?  I mean, there was consultation.  Again, your client

25    had access to expert advice, and they agreed to this

1   preliminary injunction.

2          You know, I'm not suggesting that further

3   consultation is not appropriate, and I'm sure it is, but we

4   are here where we are, and the question is, to me anyway, to

5   the Court, what to do about the request for extensions.

6          If your opposing counsel and their client wishes to

7   go a different direction, dismiss the case and submit to

8   mediation, that's fine with me.  I have no proprietary

9   interest in the cases that come before me, but once they are

10  before we, I have to do everything I can to uphold the

11  Court's prerogatives and the status of the Court and enforce

12  its orders.

13         MR. HOWARD:  Certainly, Your Honor, and we do

14  understand that.  I don't want to get into the motion if

15  there is the one attorney rule about arguing it.  Ms. Ashwell

16  is prepared to address Your Honor's questions on that.

17         I would just say that our client, in the spirit of

18  cooperation, agreed to their aggressive deadlines because our

19  client wanted to comply with those.  These are factors

20  outside of their control, which Ms. Ashwell will go over when

21  she presents our motion, Your Honor, but it is not heel

22  dragging.  It is not reluctance to cooperate.  It is not any

23  hesitancy in addressing this problem.  Our client is

24  committed to addressing this problem.

25         My fear about this litigation is that, again, at

Bristol, TN v. Bristol, VA - 1:22cv23 - 8/25/22                    12

 1    taxpayer expense, you're going to have a battle of lawyers
 2    and a battle of experts that are all at taxpayer expense
 3    debating all of the blocking and tackling, the day-to-day
 4    activities in carrying out what everyone agrees is the
 5    solution.
 6            Everyone agrees there is a problem.  Everyone agrees
 7    the solutions are to follow the recommendations of the panel
 8    of experts empaneled by DEQ.  Certainly they can find an
 9    expert firm that will look at everything our experts do and
10    criticize it and criticize it and criticize it to say we can
11    do things faster and say we can do things a different way.
12            So I fear that's what this lawsuit is going to
13    become, and it may come to that.  There may be no way for us
14    to prevent that.  That's how I see the case, Your Honor.
15            I'm going to try to get my technology working so
16    that Ms. Ashwell can present to Your Honor some of the
17    specifics on the motion, but we appreciate the opportunity to
18    be in front of Your Honor and for this hearing being set so
19    promptly and for the Court's attention and for the indulgence
20    to provide a little bit of background.
21            THE COURT:  Yes, sir.  If you need a moment to work
22    on that, that's fine.
23            MS. ASHWELL:  Your Honor, we'll take a moment, but
24    if it won't work, I will move along.  Thank you.
25            THE COURT:  All right.  You my proceed.

```
 1          MS. ASHWELL:  Your Honor, we take this Court's
 2     orders very seriously, and we understand that entering into a
 3     stipulation and asking this Court to enter an order is an
 4     extra obligation and an extra responsibility.
 5          What I'm going to do today is walk through why
 6     Bristol, Virginia, approached a complex problem and agreed
 7     solutions with a plan ahead of time that it thought through
 8     with its experts and with the people who do operational
 9     things for the city, but Bristol, Virginia, has encountered
10     obstacles that were unexpected and out of its control.
11          It exercised good faith.  It is working.  Trucks are
12     running cover out today, Your Honor, but because of things
13     out of their control, Bristol, Virginia --
14          THE COURT:  Let me interrupt you, if I might.  Have
15     you had an opportunity to review the plaintiff's opposition?
16          MS. ASHWELL:  Yes, Your Honor.  I will admit I read
17     it quickly, but I have.
18          THE COURT:  All right.  Well, I mean, to the extent
19     that you can incorporate in your remarks any view of their
20     specific allegations and concerns, that would be helpful.
21          MS. ASHWELL:  Absolutely.  Your Honor, whether our
22     technology works or not, I plan to call Mr. Eads, and we're
23     going to talk about some of those factors, but I want to
24     quickly summarize my, albeit done in the car, formulation of
25     the view on their objections.
```

1           First, as to the cover, Your Honor, we have had,

2      you'll see, 20 days of rain, and that number corresponds to

3      the number of work days that we are asking for in an

4      extension.  Twenty days of rain is unexpected.

5           You have a landfill that's surrounded by rock walls

6      with one entrance and one exit.  If we had had the time that

7      we expected when we agreed to the order, the deadline would

8      have been met, but nobody expected 20 days of rain to which

9      you add a COVID outbreak through which the city lost about

10     five weeks worth of employee work.  Now, they were able to

11     pull in some other workers.  That is pretty --

12          THE COURT:  Well, in that respect, one of the points

13     that the plaintiff raises here is that based on the

14     declaration of its witness at least, it appears that the city

15     is moving and doing these things with its staff, with the

16     staff that it has.

17          One would have thought that, you know, in an

18     extraordinary situation like this, that the city would have

19     contracted or obtained additional resources for such a task

20     rather than its usual and normal employees.

21          MS. ASHWELL:  Yes, Your Honor.  The city made a

22     judgment up front that it could do it faster if it did it

23     itself.  That's for two reasons.  Well, three really, Your

24     Honor.

25          First, by using its own employees and equipment, the

1    city did not have to put anything out for bid.  That's very

2    relevant when you consider they probably have 25 to 30 other

3    work orders out all related to proposals and recommendations

4    coming from DEQ and that they've agreed to do with Bristol,

5    Tennessee, so they could start moving dirt and moving people

6    right away.

7            If our technology works -- have we got it up?

8            MR. HOWARD:  Not yet.

9            MS. ASHWELL:  You'll see that they started moving

10   dirt, Your Honor, before the Court order was even entered.

11   In fact, they had been putting down cover, not as required by

12   your preliminary injunction, but putting down cover since

13   earlier that year.  So it was a process they knew how to do.

14   They had gotten equipment to do it, and they also learned

15   what the hazards are.

16           And, Your Honor, there is one entrance and one exit,

17   so a question I would have if I were Bristol, Tennessee, is

18   you just need more.  You need more trucks; you need more

19   people; and you need to move more dirt.  But there are

20   constraints within that landfill because of the narrow

21   entrance and because the areas in which vehicles can actually

22   run.

23           There is a dirt road, and then there is a lot of mud

24   that's on top of trash, and not all vehicles can go in those

25   other areas.  So to say, well, we need more, would actually

 1    create a very dangerous situation in the judgment of Bristol,

 2    Virginia.

 3         THE COURT:  Well, that's certainly an argument, and,

 4    obviously, I don't have any direct knowledge of that, but you

 5    mentioned the fact that they would have to put out the extra

 6    contracts for bid, but this is not like we're obtaining

 7    scientific equipment.

 8         I mean, there are a lot of people with dump trucks

 9    in Southwest Virginia who would be glad, for the right price,

10    to haul dirt for the city.  I suspect that they would get a

11    bunch of applicants.

12         MS. ASHWELL:  Your Honor, I think you could probably

13    put together a dump truck bucket brigade, but in our view the

14    limitation has not been the number of trucks bringing in

15    dirt.  In our view --

16         Justin, can you flip to the view of the entrance,

17    please.  I think it's around slide 28.

18         Here we go.  Your Honor, you can see a truck moving

19    there through the entrance.  In our view, that is the

20    bottleneck.  In fact, dirt has to be brought in to the

21    landfill, dumped where you see this excavator running, and

22    then loaded onto another vehicle that the city has specially

23    leased at about $9,500 a month to spread cover throughout the

24    landfill.  It's called the Yuke.

25         Can we flip to an image of the Yuke's tires?

```
 1              MR. HOWARD:  Sure.

 2              MS. ASHWELL:  The Yuke, Your Honor, has very large

 3    tires that allow it to run in parts of the landfill where

 4    other vehicles cannot.  You can see the tracks there.  Then

 5    in turn the dirt is spread by excavators.

 6              My sons would get after me as to whether it's really

 7    an excavator or something similar, but they have essentially

 8    tank tracks on them.

 9              This picture was taken on a day when it wasn't

10    raining.  You don't want to get down there in this area on a

11    day when it's raining.  You can see how the mud has created

12    essentially trenches.  So there are limited vehicles that can

13    go there; limited vehicles that can run.

14              Your Honor, I'm not sure I entirely -- I think you

15    had some threads to your question I didn't answer.  I

16    apologize.  Are there additional questions I did not answer?

17              THE COURT:  No.  Go ahead.

18              MS. ASHWELL:  I was going to switch to plaintiff's

19    comments regarding the thermocouples.

20              THE COURT:  Very good.

21              MS. ASHWELL:  My understanding of plaintiff's

22    objection is you should not have had to go through the

23    procurement process to get a request for drilling for

24    thermocouples out.  There are legal routes around that.  I

25    disagree somewhat on the law, but that's my understanding of
```

 1  their objection.

 2          I think their additional objection is you can get --

 3  and this is in the declaration of their expert -- you can get

 4  thermistors on quick turnaround.

 5          Your Honor, I think that misses the difficulty that

 6  we have encountered.  The difficulty that the City of

 7  Bristol, Virginia, encountered is that there is a four to

 8  eight weeks -- we've heard more recently six to eight weeks

 9  -- delay on steel casings.

10          Nobody is going to be able to meet the deadline that

11  was included in the preliminary injunction because you cannot

12  get the steel casings that stop temperature probes from being

13  crushed by the trash in the landfill.

14          THE COURT:  So are you saying that it was just a

15  mistake by the city to agree to the deadline for the

16  thermocouples?

17          MS. ASHWELL:  Your Honor, I think it's a changed

18  circumstance.  At the point in which the city put together --

19  so at the point in which the city entered into the

20  preliminary injunction, it had conversations with Bristol,

21  Tennessee, it had conversations with its expert and

22  internally about whether the deadlines could be met, and then

23  it had SCS, an engineering company that was retained

24  especially to deal with the recommendations from the DEQ

25  panel report, and thankfully also retained now that we have

1    this PI.

2            They all had conversations to consider the

3    feasibility of the deadlines in the PI, and I will

4    acknowledge Bristol, Virginia, thought that they were

5    aggressive.  It turns out none of the things that they were

6    worried about with thermocouples have been the problems that

7    stopped the thermocouples from getting in the ground by

8    September 12th.

9            That's because SCS Engineering looked at supply

10   lines.  They looked at how long things are on order.  They

11   put together a design and a bid for something that's custom.

12   You can't just stick temperature probes in a landfill and

13   expect them to be accurate, so for something that's custom,

14   and they made a judgment at the time, right, in June about

15   what was feasible and then what to put out for bid.

16           By the time the bidding conference came around and

17   only two companies came with potential bids, they began to

18   realize that something had happened with the global supply

19   chain.

20           Your Honor, we did not lodge this document, but I

21   supplied it to the other side, because we're trying not to

22   put pressure on companies that may want to bid with Bristol,

23   Virginia.

24           Can we flip to the yellow language from the drilling

25   bid?

1           Only one company supplied a bid, and it would not

2    post the bond that was required, which under federal

3    procurement law, because federal funds are involved, meant

4    the city couldn't accept it.  But regardless, Your Honor --

5           THE COURT:  Wait a minute.  I thought that the

6    plaintiff indicated that a bond was not required.

7           MS. ASHWELL:  Federal funds were being used for this

8    project, Your Honor, so a bond is required by federal

9    procurement law.

10          THE COURT:  All right.

11          MS. ASHWELL:  That required the City of Bristol,

12   Virginia, to reject the bid.  They are going to be rebidding.

13   They've actually been able to accelerate the process, and we

14   think it can get out even faster than we indicated in the

15   declaration.

16          I have a copy.  Give me just a second.  May I pass

17   this to the bailiff, Your Honor?

18          THE COURT:  You can just hand it to the clerk in

19   front of you.

20          MS. ASHWELL:  Your Honor, there is language

21   highlighted on page 3.

22          THE COURT:  All right.  Do you wish to submit this

23   as an exhibit?

24          MS. ASHWELL:  Your Honor, if you would like us to be

25   formal and submit evidence, then absolutely we will.  Again,

1    we would like to not put too much pressure on the companies

2    that would put bids in with us.

3           THE COURT:  I understand, but I don't want to

4    consider matters that are not a public record unless there is

5    some good reason to seal them.

6           MS. ASHWELL:  Yes, Your Honor.  We would like to

7    submit it as an exhibit.

8           THE COURT:  All right.  It will be the Movant's

9    Exhibit 1.

10          (Movant's Exhibit 1 marked and admitted.)

11          MS. ASHWELL:  Your Honor, on that third page the

12   drilling company indicates that it cannot meet, most likely

13   cannot meet the deadlines that the City of Bristol had

14   requested, had calculated to meet the deadlines of this

15   Court's order, have incentivized through the threat of

16   liquidated damages, because of a four to eight week supply

17   chain delay.

18          And that supply chain delay was unknown.  I don't

19   think it even existed at the time that Bristol, Virginia,

20   entered into the preliminary injunction, but by the time they

21   came to execution, it became an obstacle that made it such

22   that the deadline cannot be met.

23          That's why we came before you, Your Honor.  We take

24   the importance of these deadlines very seriously, and we had

25   an obligation to get in front of the Court to let you know

1    that we will not be able to meet that deadline.

2           THE COURT:  And you're requesting six months

3    essentially for this requirement?

4           MS. ASHWELL:  Your Honor, once bitten, twice warned.

5    We want to incentivize companies to bid.  We received

6    feedback that companies were concerned about the short time

7    for performance.

8           We are concerned that we will encounter other

9    unanticipated supply chain delays which could not exist today

10   but develop in a few months, and we want to put in time to

11   leave the bid open for a while.

12          Bidding is not just a requirement of the Procurement

13   Act; bidding is a good practice.  When you have something

14   that must be custom built that needs to last for 30 years --

15   my understanding, Your Honor, is these temperature probes

16   should go into the landfill and stay for 30 years after it's

17   permanently closed to continue to monitor the state of the

18   landfill.

19          It must be done right, and the bidding process makes

20   the companies that come to you show their work so you know if

21   they're going to be able to carry it out.

22          It would be a nightmare, Your Honor, if six months

23   from now this was done quickly, it was done without proper

24   engineering work on the front end, if the steel casings

25   weren't put in place and the trash which we suspect is not

 1   static because this is a landfill with problems we don't

 2   understand --

 3          THE COURT:  Let me interrupt you again.  Maybe just

 4   to back up a little bit, but as I understand, and obviously

 5   I'm not an expert, nor have I been provided with -- not

 6   necessarily required to be provided, but I haven't been

 7   provided with the background.

 8          The thermocouples, as I understand, are necessary in

 9   order to determine the temperature at lower depths in the

10   landfill.  Is that basically correct?

11          MS. ASHWELL:  Yes, Your Honor.

12          THE COURT:  Does that have anything to do with the

13   delivery of a landfill that does not produce the odor that is

14   complained of?  I mean, what does that do about remediating

15   this terrible odor problem?

16          MS. ASHWELL:  Why are we doing this?  Yes, Your

17   Honor.  Bristol, Tennessee, acknowledges in their brief, and

18   we are in agreement, that the thermocouples do not have an

19   immediate effect on odor.  They are not an odor mitigation

20   strategy.

21          We all want the data that they can provide.  The DEQ

22   panel report, which had some of the best experts in the

23   country brought in to look at this landfill, was unable to

24   definitively determine the cause of the smell.  So everyone

25   wants to be able to gather more temperature data from

1   throughout the landfill to figure out the causes.

2           But one of the reasons, Your Honor, we feel

3   comfortable asking for a delay of this length is we do not

4   think it is going to materially impact the citizens of

5   Bristol.

6           We think that it is an important step.  It is a step

7   that must be done right, and we will do it right, but it is

8   not something that's going to change people's daily lives

9   between now and when it's put in and when we start receiving

10  data.

11          THE COURT:  You're saying that it's not something

12  that's going to bring an early end to this terrible odor

13  problem?

14          MS. ASHWELL:  Yes, Your Honor.  That's correct.

15          THE COURT:  Okay.  You indicated that we don't know

16  what the problem is.  I mean, I just naively thought that the

17  problem was the release of gases that were produced in the

18  landfill.  I mean, isn't that right?

19          MS. ASHWELL:  At a high level, yes, Your Honor, I

20  think that is right.  Why are the gases being generated?

21  Where within the --

22          THE COURT:  Well, I take it it would be a function

23  of decomposition with water; is that not correct?

24          MS. ASHWELL:  I don't know -- someone may know the

25  answer to this.  I don't know if water is a key ingredient or

```
 1    not.  Decomposition very likely and temperature very likely,

 2    which is why we want to get the temperatures from the

 3    thermocouples and figure out where the landfill is hot.

 4           THE COURT:  This may be a basic question that I

 5    don't require an answer, but does it have anything to do with

 6    what's put in the landfill or what was put in the landfill?

 7           MS. ASHWELL:  It very likely could, and there are 20

 8    years of trash from both Bristol, Tennessee, and Bristol,

 9    Virginia, in that landfill.

10           I don't believe that there is any sense that there

11    is something unusual in that landfill, and you have two

12    landfills right next to it which received trash from mostly

13    the same sources.  So it's probably something to do, Your

14    Honor, with the rock and the temperature.

15           THE COURT:  All right.

16           MS. ASHWELL:  Your Honor, do you have any other

17    questions before I call Mr. Eads?

18           THE COURT:  No.  Go ahead.

19           MS. ASHWELL:  Thank you.

20           THE COURT:  Mr. Eads, if you'd come forward, please.

21           MS. ASHWELL:  Your Honor, I may retread some ground

22    we've covered, and I realize that we have about two hours

23    today, so if I'm moving too slowly, or if there is something

24    else you would like me to cover, please let me know.

25           THE COURT:  Yes, ma'am.
```

```
 1          MS. ASHWELL:  I neglected to say, as Your Honor is
 2    aware, the equitable -- injunctions are a creature of equity,
 3    which is very much within the power of the Court.  The Court
 4    has the power to craft and recraft remedies, and we are
 5    asking you to recraft that remedy because we believe it is in
 6    the interest of Bristol, Virginia, we think it supports the
 7    public interest, and because we think Bristol, Virginia, has
 8    shown good faith efforts to meet these deadlines, which
 9    cannot be considered in isolation.  They have to be
10    considered with the panoply of other actions that the city
11    has taken to deal with the odor issue.
12          RANDALL EADS, called by the defendant, having been
13    first duly sworn, was examined and testified as follows:
14                        DIRECT EXAMINATION
15    BY MS. ASHWELL:
16    Q.  Mr. Eads, how are you today?
17    A.  Just fine, Ms. Ashwell.
18          THE COURT:  For the record, why don't you state your
19    name.
20          THE WITNESS:  Sure.  Randall Eads, E-A-D-S.
21    BY MS. ASHWELL:
22    Q.  You hold two hats for the City of Bristol, Virginia?
23    A.  I do.
24    Q.  Can you tell me what those are and which one you're
25    testifying from?
```

1    A.  I'm the city manager and the city attorney, and I'm

2    testifying as city manager today.

3    Q.  So you're not going to -- if I accidently ask something

4    that covers attorney-client privilege, will you cause me to

5    object to my own question?

6    A.  Yes, ma'am.

7    Q.  Okay.  On January 3, 2022, you sent a letter to DEQ and

8    EPA.

9           Your Honor, that letter is attached as Exhibit 1 to

10   our motion.

11          Can you tell me what this letter was for and why you

12   sent it?

13   A.  Sure.  This letter was to ask for assistance from the EPA

14   and DEQ, whether that be technical assistant or whether it be

15   financial assistance, to help with the odor of the landfill.

16          As you noted, the letter was sent on January 3rd of

17   2022, and this was just a few weeks after Bristol, Tennessee,

18   had given the city notice of intent to sue under the Clean

19   Air Act.

20          Throughout 2021 the city had been doing everything

21   that our consultants had advised us to do.  We'd been having

22   weekly calls with DEQ, and sometimes EPA representatives were

23   on those calls.

24          Based on those conversations, what we were being

25   told to do should have remediated the odor problem; however,

1    the odor problem still existed in late 2021, and I had to

2    reach out for additional assistance because what we had

3    done -- what we thought was going to work didn't work.

4    Q.  So you just referenced two things that Bristol, Virginia,

5    did to remediate the odor problem before you put out

6    essentially this flare, right, in January of 2022.  What were

7    those two things?

8    A.  Well, we added additional gas wells.  We started with the

9    additional gas wells on September 7th of 2021.  We had to

10   drill those gas wells, and then eventually we had to install

11   the gas wells.  That began in October, I believe October 15th

12   of 2021, and they were completed sometime around December

13   20th of 2021.

14          We immediately saw an increase in the amount of gas

15   that was being collected from the landfill, so obviously we

16   still have some sort of gas emissions from somewhere.

17   Q.  So after you requested assistance from the EPA and DEQ,

18   the DEQ responded to you.  What did they do?

19   A.  DEQ actually came and visited the landfill sometime in

20   February of 2022 with director Mike Rolband and James Golder

21   or James Golden, I believe, with DEQ.

22          We visited the landfill.  We spent probably two or

23   three hours in my conference room talking about everything we

24   had done in the past.  After we visited the landfill,

25   Director Rolband suggested that we have an expert panel

1    report, or an expert panel to come and look at the landfill,

2    which I readily agreed to.

3         Eleven nationally recognized experts from across the

4    nation descended on Bristol on March 21st to look at our

5    landfill and offer suggestions.  Then the expert panel report

6    was produced on April 25th.

7    Q.  As you recognized that an expert panel report was coming,

8    what did Bristol, Virginia, do to get ready?

9    A.  Well, there was a lot of things that we did to get ready.

10   One of the things was cover.  We have been placing cover on

11   the landfill, maybe not to the degree that intermediate cover

12   requires, but cover was being placed on that landfill in

13   2021.  Then we continued to place cover on that landfill.  We

14   purchased or leased a Yuke so that we can continue to apply

15   cover to the landfill.

16   Q.  What about in terms of experts?  Did you look for an

17   expert or an engineering company to --

18   A.  That's correct.  We did.  As we went through 2021, the

19   city wanted to go in a different direction with our

20   consultants.  So in early 2022 we placed an RFP for experts

21   or consultants to help us with our landfill situation.  We

22   had several bids, and we chose SCS Engineering in March of

23   2022.

24         MS. ASHWELL:  Your Honor, the DEQ expert panel

25   report is already in the record.  It's attached to

1    Plaintiff's complaint.

2    BY MS. ASHWELL:

3    Q.   What did the expert -- the expert panel report gave you a

4    number of recommendations.   What is the city doing based on

5    the expert panel report?

6    A.   The city is going to attempt to do everything in that

7    expert panel report as quickly as possible.

8            MS. ASHWELL:   So, Your Honor, this is an excerpt

9    from the Lamie declaration which was attached to our motion,

10   and it lays out the ten items -- ten of the items that the

11   city is acting on from the DEQ expert panel report.

12   BY MS. ASHWELL:

13   Q.   Mr. Eads, do you know how many work orders the city has

14   out related to this?

15   A.   I think we have roughly 25 to 30 work orders out at the

16   moment related to this expert panel report.

17   Q.   Am I correct in stating that the expert panel report did

18   not conclusively establish the source of the smell in the

19   landfill?

20   A.   Based upon my reading of the expert panel report, I don't

21   think it conclusively established where the odor was

22   emanating from.

23   Q.   So after the expert panel report is released and the city

24   is planning to act on it, it has a new engineering firm, the

25   City of Bristol, Tennessee, filed suit, and ultimately the

1    City of Bristol, Virginia, negotiated to enter into a

2    preliminary injunction.  Why did Bristol, Virginia, enter

3    into that preliminary injunction?

4    A.  Bristol, Virginia, wants the problem solved more quickly

5    than Bristol, Tennessee.  I can promise you that what we've

6    dealt with over the past year and a half has been

7    significant.

8           It's draining financial resources.  It's draining

9    human capital, and we know it's having an impact on the

10   quality of life for the people in our community.  If I had a

11   switch to get the smell to go away, I would have flipped that

12   switch in December of 2020 to make it go away.

13          What we want to do, and the reason we entered in

14   this preliminary injunction was simply because we're two

15   municipalities.  We have to work together on a daily basis,

16   whether that's with our police and fire, and even other types

17   of government services.  We all have to work together, and we

18   have to work for our citizens.

19          We wanted to enter into the preliminary injunction

20   in hopes that we could work together with Bristol, Tennessee,

21   to resolve this issue in an amicable matter and not expend

22   taxpayer resources on attorneys.

23   Q.  The preliminary injunction requires that Bristol,

24   Virginia, do four things in the near term.  One was provide a

25   report to Bristol, Tennessee, I believe by August 15th.  Has

Randall Eads - Direct Examination                              32

```
 1   it done that?
 2   A.  Yes, we have.
 3   Q.  One was cease accepting waste at the landfill by
 4   September 12th.  When will that occur?
 5   A.  We will cease accepting waste on September 9th.
 6   Q.  His Honor had a question about where the other waste is
 7   going.  Has that been determined?
 8   A.  That has not been determined yet.  We have an RFP
 9   outstanding that closes on August 31st.  Based on the
10   interest that we have received, we anticipate we will receive
11   at least one, if not two, bids for that.
12            THE COURT:  Let me ask you this, Mr. Eads.  So I was
13   correct that you have not yet determined where the waste is
14   going to go?
15            THE WITNESS:  That's correct, Your Honor.
16            THE COURT:  I mean, is it going to be a problem
17   about that, you know, between now and -- you know, you have
18   to do something with the waste.
19            THE WITNESS:  That's right, Your Honor.
20            THE COURT:  It just can't pile up somewhere.
21            THE WITNESS:  You're exactly right.
22            THE COURT:  So what's your decision chain here?  I
23   mean, just hope that you get somebody and hope you don't have
24   to come back to me and ask for another extension?
25            THE WITNESS:  Well, hope doesn't do us any good in
```

1    your court.  We have to show actions.  If by chance we do not

2    get a bid or a nonresponsive bid like we received on the

3    thermocouples, worse case scenario is we can take our

4    collection trucks to the closest landfill, which is in

5    Blountville, and we'll just pay the gate rate.

6            THE COURT:  I take it to find another place to

7    deliver the waste of Bristol, Virginia, you have to negotiate

8    a price, correct?

9            THE WITNESS:  That's correct, Your Honor.

10           THE COURT:  So that's another variable, I take it.

11   I mean, I would guess, maybe I'm wrong, but that some of the

12   locations where you might take the waste would say, well,

13   Bristol, Virginia, is in a tight spot here.  They've got a

14   federal judge looking at them and an agreement on the time.

15   Let's make a little money off this deal.  Is that a --

16           THE WITNESS:  I mean, that's a real possibility.

17   It's a concern, but ultimately we have to cease accepting

18   waste, and we will take our waste wherever we negotiate a

19   price.

20           THE COURT:  It's my understanding that you're no

21   longer accepting waste from third parties, which you had been

22   before; is that correct?

23           THE WITNESS:  We're still currently accepting some

24   waste from third parties.  I believe some third parties have

25   already found other locations at this point, but there is

1    some third party waste coming into the landfill at this

2    point, but as of September 9th no more waste will be coming

3    in either from the city or from third parties.

4              THE COURT:  All right.  Go ahead.

5    BY MS. ASHWELL:

6    Q.  I'm going to transition now to talk about the two

7    requirements that brought us here today.  I'm going to start

8    with cover.

9              The preliminary injunction requires that Bristol

10   spread cover.  You talked about this a little bit earlier,

11   but this is not the first time the City of Bristol has spread

12   cover.  Can you briefly remind us of that?

13   A.  Sure.  In early 2021, it may have been in late '20, I

14   don't remember exactly when, but I do believe there is a

15   rental agreement that we have in late 2020, December of 2020,

16   where I instructed staff to start covering the landfill.

17             For a number of years DEQ allowed the city to mine

18   landfill 498 and use that as daily cover.  Once the smell

19   began, with consultation with DEQ, we started putting dirt or

20   clay on top for cover.

21             THE COURT:  Let me understand this process exactly.

22   You talk about daily cover, and I take it that that is the

23   dirt that you put on waste that has been delivered that day.

24             THE WITNESS:  That's correct, Your Honor.

25             THE COURT:  So you cover it up?

 1           THE WITNESS:  Yes, Your Honor.  Now, the city has

 2     not been very good about doing that, I'll be the first to

 3     admit.  Over time, for whatever reason, the city allowed and

 4     DEQ allowed waste from --

 5           THE COURT:  You got behind, in other words?

 6           THE WITNESS:  Yes, we got behind, but the DEQ

 7     allowed waste from landfill 498 to be used as daily cover

 8     instead of forcing the landfill to use dirt or clay.

 9           THE COURT:  Explain that to me.  How would you use

10     waste from another landfill?

11           THE WITNESS:  I always ask that question myself

12     because it just didn't make sense to me.  But based on

13     conversations with DEQ and my staff, that was what was being

14     allowed for a number of years at our landfill.

15           THE COURT:  But to cover the landfill, it's more

16     than just daily cover, right?  You have more depth of cover

17     required; is that right?

18           THE WITNESS:  That's correct.  There is a daily

19     cover and then an intermediate cover.  The intermediate cover

20     is what we're applying right now, which would be 12 inches of

21     dirt on top of the waste.

22           THE COURT:  All right.  Go ahead, ma'am.

23           MS. ASHWELL:  Your Honor, I'm going to hand up what

24     we'll make our second exhibit.  That second exhibit has not

25     previously been placed in the record.

```
 1            THE COURT:  All right.  It will be admitted as
 2    Movant's Exhibit 2.
 3            (Movant's Exhibit 2 was marked and admitted.)
 4    BY MS. ASHWELL:
 5    Q.  Mr. Eads, I'm going to show you an email and ask you if
 6    you can identify it for me, please.
 7    A.  Sure.
 8    Q.  What is this email?
 9    A.  This is an email that I sent on June 12th, 2022, at 12:34
10    p.m. to some of my staff members and to SCS Engineering.
11    Q.  Was this email sent before the preliminary injunction was
12    entered?
13    A.  It was.
14    Q.  But you had already negotiated the terms?
15    A.  Yes.
16    Q.  Can you identify the people in the "to" line for me,
17    please?
18    A.  Sure.  In the "to" line is Michael Maine, he's our public
19    works operations manager; Mike Martin, he is our
20    administrative manager within the solid waste disposal fund;
21    and then Jeff Miles is our operations manager within the
22    solid waste disposal fund.
23    Q.  Can you tell me the purpose of this email?
24    A.  The purpose of this email was to alert those individuals
25    that we were going to be under a federal court order to do
```

1    these three things that were outlined in this email.

2    Q.  All right.  I want you to please talk about number one.

3    A.  Sure.  I told staff that this week I anticipated the

4    United States District Court for the Western District of

5    Virginia to enter an order requiring us to do the following

6    items within the next 90 days.

7         One was to provide intermediate cover of at least 12

8    inches over the entire landfill pursuant to a certain

9    Virginia administrative code section, except the working

10   face, but adequate daily cover would be required for the

11   working face.

12        Item two was install the thermocouples in the waste

13   mass, and item three was to cease acceptance of all waste

14   within 90 days.

15   Q.  I want to step back to the prior screen without the

16   blow-up for a second, if you don't mind.  There we go.

17        All right.  Can you explain the paragraph above the

18   bold and why you sent that to the people who work for the

19   city?

20   A.  Which paragraph?

21   Q.  The paragraph above the bolded language, "We will be

22   operating."

23   A.  Yes.  As a practicing attorney, whether I practice in

24   this court or other courts, I know the importance of a court

25   order, and I knew that we would soon be under a federal court

1    order.

2           You can note in the subject line I wrote urgent and

3    important.  Then in this last paragraph I advised staff that

4    we would be operating under a federal court order, and I

5    cannot stress enough that deadlines must be met with no

6    exceptions.

7           In order to protect the city, you need to start a

8    log book that documents the weather and other reasons as to

9    why work cannot be accomplished on any given day moving

10   forward; however, I do not anticipate you-all missing the

11   above noted deadlines.

12          I expect all of this to be completed on time or

13   earlier than the deadline.  Then in bold letters I advised

14   staff the 90 day deadline is Sunday, September 11th of 2022,

15   no exceptions.

16   Q.  So did people start logging the work done on the

17   landfill?

18   A.  They started the next day.

19   Q.  We're going to -- if we may move to the next page.

20          All right.  You briefly described to His Honor the

21   process of putting down cover, but can you walk me through

22   what the city does to put down this intermediate cover, this

23   12 inches of dirt?

24   A.  Sure.  We're taking dirt from a site near Exit 5 near The

25   Falls retail development site, and we are trucking that dirt

1   over in roughly four or five dump trucks on a daily basis.

2           That comes into the landfill, and you can see where

3   a dump truck is exiting through the entrance to the landfill

4   there.  That truck has probably just dumped dirt somewhere

5   near the excavator and the Yuke that you see pictured in the

6   middle of the page there.

7           So they come in, they dump that dirt, and then the

8   excavator loads the dirt onto the Yuke which then takes it

9   further into the landfill so that it can be placed at

10  specific sites throughout the site.

11  Q.  Why did the city decide to do this in house instead of

12  hiring a contractor?

13  A.  Well, if we had hired a contractor, we'd have to go out

14  to bid or RFP which would have taken at least probably 10 to

15  15 days to get a bid back from an outside contractor.

16          In consultation with staff, staff assured me that

17  they could cover this within the allotted time period.  So in

18  order to save money and to save time, more time than money,

19  we elected to do this ourselves.

20          THE COURT:  But the fact is you're doing more than

21  you did on a routine basis in terms of the daily cover, you

22  know, so why did you believe that you could do it with your

23  existing staff?

24          THE WITNESS:  I pulled staff from other departments

25  to do this.  So this was not just landfill staff working on

1    this problem.  It was staff members from other departments.

2            THE COURT:  All right.

3    BY MS. ASHWELL:

4    Q.  Did you repurpose the Streets Department?

5    A.  Yes.  The Streets Department was basically pulled off of

6    working on streets and maintaining streets to do this

7    project.

8    Q.  I spoke about this earlier, but where the blue arrow is,

9    is there any other entrance or exit to the landfill?

10   A.  That's the only entrance and exit.

11   Q.  Here you can see what you've called the Yuke.  Can you

12   walk me through the scene?  In particular, I want you to talk

13   about the road.

14   A.  Sure.  The road that the Yuke is currently on is a road

15   that all vehicles that are carrying waste use to the

16   landfill.  It's a fairly good road.  It's been -- we have

17   rock placed on it so that it doesn't shift as much as other

18   parts of the landfill, and it's compacted.  So most vehicles

19   can travel on that road; however, once you get off of the

20   gravel there, you're in dirt or mud, depending on the day of

21   the week.

22           You see the Yuke here is loaded with dirt, and you

23   can see the tracks where it's going down into the dirt to

24   place more dirt that it's currently carrying.  You can also

25   see gas lines that are kind of sticking out from behind the

1  Yuke going toward the east, and another gas well and gas line
2  is going down as well, and you can see where new dirt was
3  placed on top of waste right there.
4  Q.  Is Bristol, Virginia, moving the gas lines to put dirt
5  underneath them?
6  A.  Well, in conjunction with SCS Engineering.
7  Q.  So --
8          THE COURT:  Let me interrupt you.  This is a
9  photograph showing the deposit of dirt on the landfill
10 section, correct?
11         THE WITNESS:  Yes.  This dirt is going onto the
12 landfill.
13         THE COURT:  Is this the edge of the landfill, I
14 mean, of the uncovered waste?
15         THE WITNESS:  You can barely see in that picture
16 there, but there were gas lines, or there were gas wells that
17 follow that line of waste, and where the gas lines were, we
18 could not place dirt until it was moved.  So you can see them
19 placing dirt on top of the waste that had yet to be covered.
20         THE COURT:  But my question was:  What is that area
21 there?
22         THE WITNESS:  That is uncovered waste.
23         THE COURT:  So does this photograph show the deposit
24 of the extra layer of dirt that's required for what you call
25 the intermediate cover?

1        THE WITNESS:  Yes, Your Honor.  If I understand your

2   question, what you're seeing there is intermediate cover

3   being placed on top of that waste layer.

4        THE COURT:  Okay.  In the rest of the picture to the

5   left of where I've circled, that shows that the cover has

6   already been laid?

7        THE WITNESS:  Yes, Your Honor.

8        THE COURT:  Okay.  Thank you.

9        MS. ASHWELL:  Your Honor, this is an additional

10  picture of the Yuke depositing dirt.

11  BY MS. ASHWELL:

12  Q.  Mr. Eads, can you tell me what the vertical item to the

13  right of the Yuke is?

14  A.  Yes.  That's a gas well.

15  Q.  And is this the area where the gas line had to be moved

16  to cover trash?

17  A.  Yes, ma'am.

18  Q.  Can you explain to me what part of the process of

19  spreading cover is happening in this picture?

20  A.  For some reason, the excavator is at the site spreading

21  cover.  Typically the excavator is up where it's loading the

22  Yuke, but they must have been attempting to move some dirt or

23  some other object that they needed an excavator for.

24        Then you can also see in this picture -- this was

25  probably taken after a rain -- how deep some of that dirt is

```
 1   based on the tire tracks or tracks from equipment that have
 2   been going through that dirt and mud.
 3   Q.  Do you know how many loads the trucks have brought into
 4   the landfill, how many loads of dirt?
 5   A.  I think it's 20,000 loads, if I'm not mistaken, or 20,000
 6   tons.  20,000 tons, over 2,200 loads, I believe.
 7   Q.  I believe it's closer to 2,000 loads.
 8   A.  Okay.  That may be right.
 9   Q.  Correct me if I'm wrong, but I think around 21,000 tons,
10   so a substantial amount of dirt has been brought in.
11            THE COURT:  But do I understand that that's only
12   approximately half of what's going to be necessary?
13            THE WITNESS:  I believe that's according to the
14   plaintiff's expert, Your Honor.
15            THE COURT:  Well, do you know?
16   BY MS. ASHWELL:
17   Q.  Do you agree, Mr. Eads, that that's --
18            THE COURT:  Excuse me.
19            MS. ASHWELL:  I'm sorry, Your Honor.
20            THE COURT:  Do you know, I mean, how much more is
21   going to be required?
22            THE WITNESS:  I think we've had numbers that were
23   told to me in the mid-30,000 range.
24   BY MS. ASHWELL:
25   Q.  Can I clarify?  30,000 more or 30,000 total?
```

1  A.   Total.

2  Q.   Okay.  Let's go on to the next page.  What's happening

3  here?

4  A.   This is the excavator where -- all the dump trucks that

5  are carrying dirt from the site near Exit 5, this is where

6  they dump the dirt, and then it's placed by the excavator

7  into the Yuke.

8  Q.   Why does rain impact work in the landfill?

9  A.   Well, when we're trying to move dirt, dirt will turn to

10  mud, and it's very difficult to move wet dirt or mud and

11  place it within the landfill or even dump it out of the dump

12  truck.

13         So rain really hampers the ability for our team, or

14  any team, to load dirt and unload dirt and then spread it

15  appropriately across the landfill.  It also creates hazardous

16  conditions for equipment because mud gets slicks and vehicles

17  can get stuck.

18  Q.   So start off on a blank slate.  It's June and you're

19  looking ahead.  Here is your calendar with how many work days

20  we have until the point in August that we've reached.

21         How much rain have you had in Bristol, Virginia,

22  Mr. Eads?

23  A.   I believe 20 days.

24         MR. ASHWELL:  So, Your Honor, as you can see, the

25  blue would be the days with rain, and you can see just a

1    substantial number of work days -- a number corresponding

2    actually to the amount of time we're asking for in our

3    extension -- marked off the books.

4           THE WITNESS:  Yes.

5           MS. ASHWELL:  And, Your Honor, I need to call out a

6    mistake that we made.  We have 16 days in the declaration

7    that we attached, but there were actually 20 days.

8    BY MS. ASHWELL:

9    Q.  So after it rains, what are the conditions like in the

10   landfill?

11   A.  Well, it's just muddy.  It's slick.  Operators are unable

12   to properly move dirt and spread dirt the way they need to do

13   so.

14   Q.  These pictures were not taken on a day when it was

15   raining, correct?

16   A.  I do not believe it was raining that day.

17   Q.  But you can see the depth of the tracks, the way in which

18   the land gets compressed, the way in which the cover moves.

19          MS. ASHWELL:  Your Honor, one of the reasons that we

20   note in the declaration that we are asking for additional

21   time is also that some of the cover has moved from some of

22   the torrential rains.

23          So we know that there are places where 12 inches or

24   more were put down, but it's either compressed or run,

25   meaning you now have 9 inches in one place and maybe 15 in

1    another.

2    BY MS. ASHWELL:

3    Q.  Until the 9th of September, is the Yuke having to share

4    the road?

5    A.  Yes.  The Yuke has to share the road with commercial

6    haulers.  In this picture there are two commercial haulers

7    that are emptying waste in the landfill.

8    Q.  And they all come in and out of --

9    A.  The same one entrance.

10   Q.  Okay.  The city has experienced issues with COVID-19, not

11   unlike other parts, but how many work days have you lost in

12   the landfill due to COVID-19?

13   A.  It's a significant number of work days.  I think off the

14   top of my head we've had employees out with specific COVID-19

15   leave 132 hours.

16   Q.  And on top of that did you have normal sick leave?

17   A.  Yes, there was normal sick leave as well.

18   Q.  Did the city pull in additional workers?

19   A.  We did pull in additional workers when that happened.

20   Q.  Has the city asked people to work overtime?

21   A.  I think there have been instances, but I don't have that

22   specific number.

23   Q.  In your time as city manager, have you encountered

24   weather problems before?

25   A.  There are always weather problems.  Whether it be a

Randall Eads - Direct Examination                                    47

```
 1   strong thunderstorm or a snowstorm, there is always some type
 2   of weather that we have to deal with.
 3   Q.  Have you encountered COVID problems before?
 4   A.  Yes.  We've had significant COVID outbreaks throughout
 5   the city at varying times in 2020, 2021, and even 2022.
 6   Q.  Have you had them occur at the same time on the same
 7   project?
 8   A.  Yes, and specifically the landfill project.  We've had a
 9   significant amount of rain and COVID illness during this past
10   71 days.
11   Q.  So the last 71 days brought about two fairly large
12   problems for the city?
13   A.  Yes.
14          MS. ASHWELL:  Your Honor, I may move on.  We have
15   drone footage, Your Honor, because we wanted to show you the
16   substantial portion of the landfill that is covered in dirt
17   and where you can see fresh dirt.
18          It appears that the computer gods intervened, so I'm
19   going to move on to thermocouples unless Your Honor has any
20   questions about cover.
21          THE COURT:  No, ma'am.  You may proceed.
22   BY MS. ASHWELL:
23   Q.  Actually, I have one last question on cover.  How would
24   you characterize the harm to the public that comes from an
25   additional four weeks, 20 works days, of time to spread more
```

1   dirt?

2   A.  Well, obviously, you know, more dirt is supposed to help

3   with the odor problem.  Four weeks to someone who is

4   experiencing the odor problem, it may impact them.

5          We recognize it may impact them, but based on the

6   amount of time that we've lost due to rain and COVID

7   sickness, I think four weeks would be reasonable to allow us

8   to do that.

9          Once we get the cover placed, hopefully that will

10  help with some of the odor problems that people are

11  experiencing.

12  Q.  We talked briefly earlier about thermocouples and what

13  their purpose is, so, Your Honor, I'm going to move past that

14  and move to why did the City of Bristol, Virginia, ask SCS to

15  spend time thinking about how the thermocouples should go in

16  the landfill?

17  A.  Well, SCS is our consultants and experts on this site,

18  and SCS is also considered an expert in landfill gas

19  situations.  With their expertise in landfill gas, I thought

20  it was best to allow the experts to do their job.

21  Q.  Do you understand gas hole monitoring to be a specialty?

22  A.  Yes.

23  Q.  Does SCS have specialists in that?

24  A.  Yes.

25  Q.  Were they involved in this planning?

1  A.  Yes.

2  Q.  Can you describe to me what happens for a temperature

3  probe or thermocouples to be placed in a landfill?

4  A.  From my understanding, a drill team has to come in and

5  drill holes into the waste mass anywhere from -- I think

6  these would be at least 200 feet deep, from my understanding.

7  So they have to drill down through the waste mass using sonic

8  drilling techniques.

9           THE COURT:  How deep do you think the landfill is?

10          THE WITNESS:  I think we're at about 250 feet right

11  now.

12          THE COURT:  All right.

13          THE WITNESS:  So they have to drill into the waste

14  mass.  I think these are supposed to be around 200 feet deep.

15  Once they drill into the waste mass, there has to be a steel

16  casing placed that will protect the thermocouples that are

17  embedded within the waste.

18          Then around the steel casing it's my understanding

19  there is aggregate that's placed around that steel casing to

20  help insulate the steel casing from the heat of the landfill

21  waste mass.

22          THE COURT:  And the purpose of the thermocouples is

23  to determine temperature at the bottom or at various levels?

24          THE WITNESS:  At various levels, Your Honor.  I

25  think this design plan calls for temperature intervals at

1    every ten feet.

2            THE COURT:  And that is supposed to determine

3    something about the cause --

4            THE WITNESS:  Yes, Your Honor.

5            THE COURT:  -- or what is it supposed to do?

6            THE WITNESS:  Well, this is based upon the expert

7    panel recommendation, and I think what the experts all want

8    is more data to be able to make a better determination of

9    exactly what's going on within our waste mass.

10           We know we have elevated landfill temperatures, but

11   what I think they want to see are those temperatures

12   traveling within the landfill and moving to the north, south,

13   east, or west?  Are they continuing to rise, or are they

14   staying at a certain temperature and not changing?  And is

15   the size of the elevated landfill temperatures in that area,

16   is it staying the same size?

17           THE COURT:  You indicated earlier in your testimony

18   that you don't think we actually know what's causing the

19   odor; is that right?  I mean, specifically.  It's obviously

20   coming from the landfill.  That's determined.

21           THE WITNESS:  Yes, it's coming from the landfill,

22   and I think it's hydrogen sulfide gases is what's causing the

23   odor, and those are being produced within the landfill waste

24   mass.

25           THE COURT:  Well, is it coming from the escaping

Randall Eads - Direct Examination                              51

```
 1   gas, and does the gas escape in certain places?
 2            THE WITNESS:  Sure.  In my opinion, and I'm not a
 3   landfill expert, there are a couple of chimneys within the
 4   landfill where you can go on just about any given day and
 5   notice gas escaping from these chimneys at the landfill.  And
 6   these chimneys are located near the liner, the rock wall
 7   liner.
 8            THE COURT:  When you say "chimneys," you don't mean
 9   manmade chimneys, but just actual --
10            THE WITNESS:  Just where you see gas escaping from a
11   certain area.  In my opinion, that's where the gas is
12   escaping from.
13            We do have surface emission monitoring.  We do
14   notice through surface emission monitoring that some gases
15   are escaping from the surface of the landfill, in particular
16   near the gas wells, which requires us to place more dirt
17   around those gas wells and compact it better so the gas would
18   not escape from around those gas wells.
19            THE COURT:  Covering the -- getting back to the
20   cover, intermediate covering of the landfill as you've
21   described, we hope that that ameliorates the odor problem
22   because it will not permit the gas to escape from the
23   landfill generally; is that --
24            THE WITNESS:  I think that's what I hope, and I
25   think that's what the experts hope as well.  But once again,
```

1    I go back to the chimneys.  I think the chimneys are creating

2    the issue, and part of the expert panel report was to create

3    a sidewall liner -- that's item number one, I think, in the

4    preliminary injunction -- to create a sidewall odor

5    mitigation system around the liner of the landfill which

6    would help reduce those chimney emissions.

7              THE COURT:  But that's a year off, right?

8              THE WITNESS:  That's correct, Your Honor.

9              THE COURT:  So how are we coming with that?

10             THE WITNESS:  Well, I think that's a design -- from

11   my understanding, the engineers do not know of another

12   landfill where this has been attempted like this, and they

13   are designing that.

14             In the expert panel report it's noted in the report

15   that certain areas will have to be tested.  It will have to

16   be designed and tested before you move through the whole

17   4,800-foot long space around the sidewall liner.

18             THE COURT:  All right.  Thank you.  I'm sorry I've

19   gone in a different direction, but go ahead.

20   BY MS. ASHWELL:

21   Q.  After SCS formulated the thermocouples, what did the city

22   do to put it out to bid?

23   A.  Well, once we received the specifications from SCS, we

24   put it out to bid on July 8th with a prebid conference

25   scheduled for July 13th.

1            On the July 13th prebid conference two potential

2     bidders were in on that conference, and from my understanding

3     -- I was not on that conference, but from my understanding,

4     they had some concerns, which the SCS engineers had to do an

5     addendum to the bid which extended the bid an additional ten

6     days, and it closed on July 29th.

7     Q.   Did the city get any bids?

8     A.   We received one bid from M & W Drilling.

9     Q.   What concerns did that bid raise?

10    A.   It was nonresponsive.

11    Q.   Why was it nonresponsive?

12    A.   It was nonresponsive because the RFP required a bid bond,

13    and M & W Drilling would not put up a bid bond.

14    Q.   Why did the city go through the RFP process and require a

15    bond of the bidder?

16    A.   This project is going to be paid for through the American

17    Rescue Plan Act money that the city received, which is

18    federal money.  Pursuant to 2 CFR 200.326, a bid bond is

19    required.

20    Q.   Did the bidder alert you to a four to eight week supply

21    chain delay?

22    A.   They did.

23    Q.   And did your engineers independently investigate that

24    supply chain delay?

25    A.   Yes, from my understanding, they investigated that.

1    Q.  So what's the city going to do now?
2    A.  Well, SCS has redrafted the bid.  We anticipate having
3    that bid posted tomorrow.  Today is Thursday, tomorrow is
4    Friday, so we anticipate having that posted tomorrow on the
5    Virginia vender website.  It's called EVA where all people
6    can place a bid.  It should be placed tomorrow, and it will
7    close within 30 days.
8            Based on feedback that SCS had received, we extended
9    the time period for someone to submit a bid to 30 days, and
10   we also reduced liquidated damages so that people would not
11   feel like they were going to be penalized a significant
12   amount if certain deadlines were not met.
13   Q.  Why did you include liquidated damages before?
14   A.  Because it's important that that project get done on time
15   pursuant to this Court's order.
16   Q.  So you had included that to meet the original deadline in
17   this matter?
18   A.  Yes.
19           THE COURT:  So what are the present liquidated
20   damages?
21           THE WITNESS:  In the new bid, I think the first ten
22   days I believe is $500, and then after that it's $1,000 a
23   day.  It's $500 per day for I think the first ten days.  To
24   the best of my recollection, I think it's the first ten days.
25           THE COURT:  And what does the bond cover in this

1    instance?

2            THE WITNESS:  In this instance, a bid bond covers

3    the fact that they're going to do the project for the price

4    that they submit the bid on.

5            THE COURT:  Okay.  Go ahead.

6    BY MS. ASHWELL:

7    Q.  In putting a request in to the Court, can you explain the

8    factors that went into the length of the request?

9    A.  For?

10   Q.  The extension.  Can you explain why we asked for such a

11   long extension?

12   A.  Yes.  Based on feedback that we received from different

13   vendors, for steel casing it looks like there is a six to

14   eight week lead time for us to get the steel casing.  Then

15   for the thermocouples there is a six to eight week lead time

16   on that.

17           From my understanding based on the design work and

18   based on the recommendations of our experts, it's best that

19   the thermocouples be ordered custom based on each well depth

20   instead of just ordering thermocouples and then attempting to

21   put them in not custom made to that specific well.

22   Q.  We talked about this some, or I talked about this some

23   earlier, but the time for the delay, do you expect that to

24   have an impact on the daily life of the people who live

25   around the landfill?

1    A.  From my understanding, this would not have an impact on

2    their daily life.

3              THE COURT:  Well, to the extent, though, that we

4    don't know what's really causing the odor -- I mean, we have

5    some idea about it, but these thermocouples are, I assume,

6    designed to try to give us better answers in that regard?

7              THE WITNESS:  It would provide us data.

8              THE COURT:  If, in fact, the cover of the landfill

9    and the sidewall sealing doesn't do the trick, thermocouples

10   may be important in finding the ultimate cause and solution,

11   right?

12             THE WITNESS:  It would.  Based on the expert panel

13   report and based on the fact that I was in with the expert

14   panel, I believe that that data would be significant so that

15   engineers could determine exactly what's going on.

16             THE COURT:  So the sooner the better I guess is what

17   I'm saying.

18             THE WITNESS:  The sooner the better.

19             THE COURT:  This is not the magic solution once the

20   thermocouples are in, but if all else fails, this may be plan

21   C, D, or F?

22             THE WITNESS:  We're probably on plan F at this

23   point, Your Honor.  This at least gives scientists data so

24   that they can evaluate what's going on and hopefully give us

25   another solution if the solutions that were recommended in

1   the initial report don't offer relief to the citizens.

2        THE COURT:  Thank you.

3   BY MS. ASHWELL:

4   Q.  Mr. Eads, has the city taken other steps to gather data

5   from the landfill?

6   A.  Well, we're in the process of installing gas well

7   temperatures right now on certain gas wells so that we can

8   measure the temperature from the gas wells.

9   Q.  So that will give you some additional data about the

10  temperature in the landfill?

11  A.  Yes.

12  Q.  Do you also track surface emissions at the landfill?

13  A.  They do.  We're tracking surface emissions on a weekly

14  basis.

15  Q.  So thermocouples are not the only source of data at the

16  landfill?

17  A.  That's right.

18        MS. ASHWELL:  Give we just one moment, please.

19        THE COURT:  Counsel, let me make a suggestion.

20  We've been going a while.  Why don't we take a short break.

21        MS. ASHWELL:  I'd appreciate that, Your Honor.

22        THE COURT:  We'll be in recess.

23        (A recess was taken from 3:48 p.m. to 3:55 p.m.)

24        THE COURT:  All right.  You may proceed.

25        MS. ASHWELL:  Thank you, Your Honor.  I have one

1    clarifying question, and then I'm going to try to show you

2    the drone footage.

3    BY MS. ASHWELL:

4    Q.  Mr. Eads, earlier we looked at an email of yours, and it

5    instructed -- it's the June 12th email, and it instructed

6    people to put down cover, and in that email you said "except

7    over the working face of the landfill."

8    A.  Yes.

9    Q.  Do you understand that the preliminary injunction

10   requires intermediate cover to be put down over what is

11   currently the working face of the landfill?

12   A.  Yes.  Once we cease accepting waste, the intermediate

13   cover would go over that area of the landfill.

14   Q.  Did you instruct people to reduce the size of the working

15   face to aid in the installation of coverage?

16   A.  I have instructed that, yes.

17        MS. ASHWELL:  Your Honor, this is footage that was

18   taken by a drone that belongs to the city on August 23rd, and

19   we're going to try to show you the work that's been done, the

20   progress that's been made in putting down cover.

21   BY MS. ASHWELL:

22   Q.  Randy, do you want to narrate our visual?  Or Mr. Eads,

23   do you want to tell us about it?

24   A.  Yeah.  This is coming from the north going towards the

25   south end of the landfill.  As you can see, there is the

1    compacted road where commercial waste haulers go into the

2    landfill and eventually get to the working face up in the top

3    right-hand corner and dump their waste, and you can see our

4    large dozer there moving the waste around.

5            That area you see of the open space there that is

6    gray, that's what we consider the working face of the

7    landfill.  You can see that there has been cover placed over

8    a large majority of the landfill during this time period.

9            Pretty soon we're going to circle back to the east

10   of the landfill here in a moment, and you can get a better

11   view as you look north.

12   Q.  Mr. Eads, what are the lines that cut vertically across

13   the screen?

14   A.  Those are the gas lines.  Those gas lines had to be

15   moved.  You can see this waste stream going from west to

16   east, and there is a gas line on top of that waste stream.

17           SCS has to come in, disconnect that gas line, and

18   then we place dirt on top of that waste, and then the gas

19   lines go back on top of the dirt.

20           You can see right here at the bottom of the screen

21   that's where we just did that there.  Everywhere you see the

22   gas lines we've had to cover the waste.

23           THE COURT:  And the purpose of those gas lines is

24   what?

25           THE WITNESS:  Those gas lines collect the methane

1   gas that's being produced from the landfill, and it is sent

2   to either the flare that burns the gas off or to a gas energy

3   company that is on site that converts the gas to --

4           THE COURT:  How do the lines collect the gas?  I'm

5   not sure I understand.

6           THE WITNESS:  The gas -- I may be explaining this

7   wrong.  There are two experts in the courtroom that can

8   explain it better probably, but the gas is just collected.

9   It's sucked in from the waste, and then it goes into the gas

10  well that you see sticking up out of the waste, and then it

11  moves on through the gas lines to either the flare or to the

12  gas energy site.

13          THE COURT:  I see.

14          MS. ASHWELL:  Your Honor, I don't have any

15  additional questions.  Please answer any questions from

16  Mr. Lacy.

17          THE COURT:  Mr. Lacy.

18          MR. LACY:  Yes, Your Honor.  Give me one moment.

19                      CROSS-EXAMINATION

20  BY MR. LACY:

21  Q.  Good afternoon, Mr. Eads.  Good to see you again.

22  A.  It's always a pleasure.

23  Q.  Mr. Eads, based on my notes, I believe you testified

24  earlier that it's Bristol, Virginia's position that it is

25  moving as quickly as possible to implement the requirements

Randall Eads - Cross-Examination                            61

1    or satisfy the requirements of this Court's preliminary

2    injunction order.  Is that your testimony here today?

3    A.  That's my testimony.

4    Q.  Okay.  I believe you also testified that it's Bristol,

5    Virginia's position that it's moving as quickly as possible

6    to implement the recommendations of the expert panel report;

7    is that your testimony here today?

8    A.  Yes.

9    Q.  Okay.  Now, the expert panel report was published on

10   April 25, 2022, correct?

11   A.  Yes.

12   Q.  And one of the immediate action items identified in that

13   expert panel report was for Bristol, Virginia, to come into

14   compliance in terms of putting down the requisite amount of

15   intermediate cover required by Virginia regulations, correct?

16   A.  I don't recall that in that expert panel report.

17   Q.  You don't?

18   A.  No, I do not.

19   Q.  All right.  Let me see if I can refresh your

20   recollection.

21          MR. LACY:  May I approach, Your Honor?

22          THE COURT:  You may.

23          MS. ASHWELL:  Your Honor, may we see what he's

24   referring to?

25          MR. LACY:  Sorry.  This is a -- actually, let me

1  transition slightly.

2  BY MR. LACY:

3  Q.  You would agree with me that the intermediate cover

4  requirement is in the preliminary injunction order, correct?

5  A.  Yes.

6  Q.  And prior to the preliminary injunction order being

7  entered by this Court, Bristol, Virginia, was not in

8  compliance with the intermediate cover requirement set forth

9  in Virginia regulations, correct?

10 A.  I'd leave that up to DEQ as to whether or not we were in

11 compliance.

12 Q.  Is it your testimony here today that Bristol, Virginia,

13 was in compliance with those regulations?

14 A.  I'm not saying we were; I'm not saying we weren't.  I

15 just know DEQ had told us to put cover on the landfill.  I do

16 not recall them saying place intermediate cover.

17 Q.  You understand as city manager that Bristol, Virginia, is

18 obligated to comply with the intermediate cover requirements

19 set forth in the Virginia regulations governing landfills,

20 correct?

21 A.  If that's the regulation, yes.

22 Q.  Are you not familiar with that regulation?

23 A.  I am familiar with that regulation.

24 Q.  Again, is it your position here today as city manager of

25 Bristol, Virginia, that Bristol, Virginia, was in compliance

1   with that cover requirement as of June 14, 2022?

2   A.  I've never testified we were in compliance with the

3   intermediate cover requirement.

4   Q.  That's exactly why I'm asking you right now.  Were you or

5   were you not?

6   A.  Mr. Lacy, you know, I can tell you that DEQ has advised

7   us to place additional cover on there.  I don't think that

8   DEQ has ever told us to have intermediate cover based on

9   conversations I've had with DEQ.

10  Q.  Well, how about the Virginia regulations that anybody can

11  go see that's got an internet connection or access to a law

12  library.  You're familiar with those regulations, correct?

13  A.  I am familiar.

14  Q.  I'll ask you for the third time, is it Bristol,

15  Virginia's position that as of June 14, 2022, it was in

16  compliance with the intermediate cover requirements required

17  by Virginia regulations?

18  A.  If you believe that we weren't in compliance, I mean, I

19  can't sit here and say that we were or were not in

20  compliance.  I did not go out and measure that landfill prior

21  to June 14th to see if we were in compliance.

22  Q.  Prior to June 14, 2022, Bristol, Virginia, was not moving

23  50 tons or loads of dirt a day into the landfill to place

24  cover on the landfill, correct?

25  A.  I do not believe we were.

1   Q.  Okay.  In fact, isn't it true that Bristol, Virginia,

2   was not placing any intermediate cover on the landfill prior

3   to June 14, 2022?

4   A.  I don't know whether or not they were placing

5   intermediate cover.  What I do know is in 2021 we rented a

6   Yuke to place cover on the landfill.

7           Again, in March of 2021 we rented a Yuke to place

8   cover on the landfill.  Then in July of 2021 we entered into

9   a lease for a Yuke so that we could continue to place cover

10  on that landfill.

11  Q.  In July of 2021?

12  A.  Yes.

13  Q.  The expert panel report was issued on April 25, 2022.

14  That's what you just testified to, right?

15  A.  Yes.

16  Q.  And Bristol, Virginia, did not take any action to place

17  any intermediate cover at the landfill after that report was

18  issued, correct?

19  A.  Bristol, Virginia, was placing cover on the landfill.

20  Whether it met the intermediate cover requirements, I do not

21  know.  I did not go out and measure the cover.

22  Q.  Okay.  You keep on referring to the Yuke.  That's the

23  large-wheeled vehicle that your counsel showed you in the

24  pictures, correct?

25  A.  Yes.  It's also called an articulating truck.

Randall Eads - Cross-Examination                                    65

1   Q.   Okay.   That's just one Yuke you-all at Bristol, Virginia,

2   are using?

3   A.   That's correct, one Yuke.

4   Q.   Okay.   Now, I believe your testimony earlier with respect

5   to the cover is that it was Bristol, Virginia's position that

6   it could do it quicker and cheaper in-house effectively,

7   right?

8   A.   That was a determination I made after consulting with my

9   team.

10  Q.   But nothing stopped Bristol, Virginia, from using its

11  in-house resources but also contracting with a third party to

12  bring in intermediate cover so it could comply with the

13  requirements of this Court's preliminary injunction order,

14  right?

15  A.   We believe it was an operational hazard to have that many

16  trucks coming in and out at one time through the one entrance

17  and exit to the landfill and based upon the fact that there

18  is only one road throughout the landfill.

19  Q.   Well, you certainly could have operated these trucks on

20  the weekend, correct?

21  A.   They could have been.

22  Q.   But Bristol, Virginia, has not done that, correct?

23  A.   I'm not sure if the staff has worked on the weekend or

24  not.   I do believe they have worked some weekends.

25  Q.   But to the best of your knowledge, not a single truck has

1    brought cover to that landfill on any weekend since June 14,

2    2022, correct?

3    A.  I cannot testify to that.  I do not know.

4    Q.  Okay.  Now, I believe you testified earlier that

5    approximately 21,000 tons of cover have been applied since

6    June 13, 2022, correct?

7    A.  I think I testified to 22,000, but counsel corrected me.

8    Q.  Just to be clear, is it correct that since June 13, 2022,

9    Bristol, Virginia, has placed 20,941.39 tons of cover at the

10   landfill?

11   A.  According to the spreadsheet that we've provided, yes.

12   Q.  Okay.  And you would agree with me that only 25 percent

13   of the landfill has the requisite intermediate cover on it as

14   we sit here today?

15   A.  I cannot agree with you on that or disagree.

16   Q.  So you don't know?

17   A.  I do not know.

18   Q.  Okay.  Likewise, you don't know, do you, that it would

19   take approximately 40 -- yeah, 40,000 tons of cover to

20   satisfy the intermediate cover requirements, correct?

21   A.  I believe that's what you had put in your brief in

22   opposition or memo in opposition, I think.

23   Q.  And you have no reason to disbelieve that figure,

24   correct?

25   A.  I have no reason to disbelieve it.

```
 1   Q.   Okay.  Now, with respect to the thermocouples, you said
 2   that the funds to be used to pay for the thermocouples are
 3   coming from the American Rescue Fund Act; is that correct?
 4   A.   American Rescue Plan Act.
 5   Q.   Plan Act.  Okay.  Is that just COVID money from the
 6   federal government?
 7   A.   That's correct.
 8   Q.   Now, the bid you received for the thermocouples was in
 9   the amount of $495,000?
10   A.   I think it's $497,000.
11   Q.   Actually, I have it right here.  It's $494,525, correct?
12   A.   Yes.
13   Q.   Now, as of June 30, Bristol, Virginia, had -- as of June
14   30 of this year, Bristol, Virginia, had $29 million in its
15   bank, correct?
16   A.   Well, that's split out into different funds, but
17   $29 million total, roughly.
18   Q.   Okay.  So clearly Bristol, Virginia, has more than ample
19   funds to pay for the thermocouples, correct?
20   A.   Bristol, Virginia, does have those funds, yes.
21   Q.   So it did not need to use the federal funding to pay for
22   these thermocouples, right?
23   A.   Well, as you know, there is an expert panel report that
24   has several, ten different projects at least, that require
25   significant expenditures, and the total right now without
```

1    these going out to bid based on best estimates is roughly

2    $18.5 million.

3          The City of Bristol, not only do we have to continue

4    to pay employees, pay utilities, and do the services

5    required, so we do have to have a certain amount of money

6    left in the bank without expending all of those dollars.

7    Q.  So based on your estimates, you could pay for the

8    entirety of the work called for by the expert report and

9    still have approximately $10- or $11 million left in the

10   bank?

11   A.  No, because some of that is in the reserve funds.  We

12   would have it in the bank, but it's reserve funds.  It's

13   restricted.

14   Q.  Sure, but you have cash on hand to pay for everything.

15   You don't need to use federal funds, right?

16   A.  We don't need to use federal funds for anything, at least

17   as it stands today.

18   Q.  And if you didn't use federal funds for the

19   thermocouples, you wouldn't have the performance bond

20   requirement that you put in the bid, correct?

21   A.  Yes, we would.  Pursuant to Virginia code 2.2-4337, bid

22   bonds are required for projects over $350,000 and over

23   $500,000.

24   Q.  Okay.  Let's talk about -- that's the Virginia

25   Procurement Act, correct?

1   A.   That's correct.

2   Q.   The Virginia Procurement Act has an exception to the

3   requirement to bid out projects, right?

4   A.   Yes.

5   Q.   For emergencies, correct?

6   A.   That's correct.

7   Q.   And this landfill situation is an emergency, correct?

8   A.   You've characterized it as an emergency.  The Virginia

9   Department of Emergency Management did not characterize it as

10  an emergency.

11  Q.   So your testimony here today as city manager of Bristol,

12  Virginia, is that the landfill and all of the odors and all

13  the other issues caused by the landfill is not an emergency?

14  A.   I've also talked with DEQ, and DEQ would not declare it

15  as an emergency in June of last year.

16  Q.   I asked about what your testimony is today.  As city

17  manager of Bristol, Virginia, is it your testimony today that

18  the landfill problems, including the incredibly noxious odors

19  that are coming from the landfill, does not constitute an

20  emergency?

21  A.   Based on conversations I've had with the Virginia

22  Department of Emergency Management and DEQ, it would not

23  constitute an emergency.

24  Q.   Let me ask you this:  Do you think the situation with the

25  landfill is such that you could have not put this

1   thermocouple project or bid out to bid because it was an

2   emergency?

3   A.  It was not an emergency.  I have a procurement manager

4   and a chief financial officer that advise me on procurement

5   matters, and I'm going to listen to those experts as it

6   relates to procurement.

7   Q.  Even though you're a lawyer?

8   A.  Even though I'm a lawyer.

9   Q.  Okay.  Do you have any data -- do you disagree that the

10  required thermistor insulation piping could be obtained

11  within four weeks of an order placement?

12  A.  Do I disagree with that?

13  Q.  Yeah.

14  A.  Based on the response we received from M & W Drilling, I

15  think they said it would be four to eight weeks.

16  Q.  Okay.  Now, at the beginning of your testimony, I believe

17  you testified that throughout 2021 Bristol, Virginia, was

18  doing everything it was being told to do by its consultants,

19  correct?

20  A.  That's correct.

21  Q.  All right.  You would agree with me that in 2021 the

22  Virginia Department of Environmental Quality issued no less

23  than six notices of violation to Bristol, Virginia, relating

24  to its operation of the landfill?

25  A.  That's correct.

1   Q.  So notwithstanding that you were listening to all of your

2   experts, you're still getting notices of violation from DEQ,

3   correct?

4   A.  That's correct.

5   Q.  And you would agree with me, wouldn't you, that -- one

6   moment.  My apologies, Your Honor.

7          You would agree with me that prior to the

8   empanelment of the expert panel, Bristol, Virginia, was not

9   putting down enough cover to meet the intermediate cover,

10  correct?

11  A.  I have testified to that before.  I do not know if there

12  was enough cover or not.  I did not go out and measure the

13  cover that was being placed.

14  Q.  Okay.  Now, prior to, or in January of 2021 you told the

15  Bristol, Virginia, City Council that they needed to start

16  listening to their experts about the operations and finances

17  of the landfill, correct?

18  A.  About their operations and what?

19  Q.  Finances of the landfill.

20  A.  If you're reading from one of my emails, then I think the

21  email speaks for itself.

22  Q.  You also said that it's time for the council to start

23  listening to experts about the operations and finances of the

24  landfill, correct?

25  A.  If that's what my email says, then that's what I'll stand

1   by.

2   Q.  And your expert is SCS, correct?

3   A.  Draper Aden at the time.

4   Q.  All right.  Well, at that time did SCS prepare road maps

5   for Bristol, Virginia, to follow with respect to the

6   landfill?

7   A.  They were just involved I think at -- what date was that

8   email?

9   Q.  January of 2021.

10  A.  They were just involved in the landfill gas collection at

11  that time.

12  Q.  Up to that point, Bristol, Virginia, had chosen to ignore

13  expert advise, correct?

14  A.  There's a whole context to that email that I'll be more

15  than happy to go into if you'd like.

16  Q.  No.  I just want to know whether as of January 2021 the

17  Bristol, Virginia, council had chosen to ignore its expert's

18  advise?

19  A.  I think I said in my email that it's time to start

20  listening to the experts.

21  Q.  Yeah.  I think you go on to say, "I know SCS has not

22  provided the answers some of you-all are looking for as it

23  relates to the landfill, but they do this for a living and

24  should be given credit for the knowledge they bring to the

25  table," right?

1    A.   I had two council members who felt they were landfill

2    experts and were trying to advise me on how I should best

3    handle the landfill.   That was the purpose of that email.

4    Q.   And after you sent that email, DEQ proceeded to issue an

5    additional seven notices of violation with respect to the

6    operation of the landfill, correct?

7    A.   I don't believe seven on 588.   I think there were only

8    six for 588.

9    Q.   Okay.   So I believe you testified earlier the purpose of

10   the thermocouples is to gather data to help understand what

11   is causing the odors at the landfill, correct?

12   A.   That's my understanding.

13   Q.   So gathering that data will help, in theory, mitigate the

14   odor problem at the landfill, correct?

15   A.   Yes.   I think Judge Jones and I covered that earlier, I

16   believe.

17   Q.   And prior to the issuance of the preliminary injunction

18   order, you consulted with your consulting experts as to the

19   deadlines by which Bristol, Virginia, could satisfy the

20   requirements that are in the preliminary injunction order,

21   correct?

22   A.   I think we all had a phone call on June the 6th at 3:00

23   p.m.   I was traveling back from the Cleveland Clinic and

24   stopped at a rest area or a gas station in West Virginia and

25   had that phone call with you-all.

1            Your experts disagreed with some of my experts'
2    recommendations that the timeline should be extended.
3    However, we went ahead and entered into that agreement based
4    on the fact that we're a municipality.  We want to work with
5    Bristol, Tennessee, and resolve this issue, and we thought,
6    in our best judgment, we would do our very best to meet those
7    deadlines.
8    Q.  Yet since the Court entered that preliminary injunction,
9    you did not contract with a third party to help bring in more
10   dirt to meet the cover requirements, correct?
11   A.  My team advised me that they could do that.
12   Q.  Bristol, Virginia, did not forgo the bidding process
13   under the emergency exception of the Virginia Procurement Act
14   in order to more quickly meet the thermocouple requirement,
15   correct?
16   A.  As far as I know, no one has declared the landfill an
17   emergency.
18   Q.  As far as you know, does it need to be declared an
19   emergency for you to invoke that exception?
20   A.  It states that it needs to be an emergency.
21   Q.  But to be clear, the regulation doesn't say that there
22   needs to be some declaration by any government body that it's
23   an emergency.  That's up to the municipality that's doing the
24   bidding, right?
25   A.  As I testified before, I discussed this with DEQ in 2021

Randall Eads - Cross-Examination                                    75

1    to declare the landfill an emergency.  They told me that they

2    did not or would not advise me to declare an emergency.

3            Also, Virginia Department of Emergency Management

4    gave a presentation to council on November the 9th of 2021

5    stating that the landfill would not constitute an emergency.

6            THE COURT:  I guess the question to you is

7    whether -- you know, these other governmental bodies don't

8    have to declare an emergency for the city, through its

9    manager, to determine that there is an emergency in sort of a

10   common sense way rather than some declaration by a government

11   agency?

12           THE WITNESS:  That's correct.  It could be up to the

13   city.

14           THE COURT:  So I think the question to you is:  If

15   you believe that you had that power to determine that this is

16   an emergency in sort of a dictionary sense of the word, that

17   would allow you to forgo the bond requirement?

18           THE WITNESS:  I think it would allow us to forego

19   the procurement process.  Not necessarily the bonding

20   requirement, but it would allow us to forego the formal steps

21   in the procurement process.

22           However, if we're using federal funds for any of

23   these projects, we would still have to go through the

24   procurement process.

25           THE COURT:  Right.  Although counsel has pointed out

1    that you really didn't -- I mean, the city is flush right

2    now, fortunately, and you didn't have to use federal funds.

3            THE WITNESS:  At the time when we were putting the

4    bids together, we thought it would be best to use federal

5    funds and save city dollars for projects within the city.

6            THE COURT:  Well, I certainly understand that, but I

7    just wanted to get your assent that you could have used them.

8            THE WITNESS:  We could have used local --

9            THE COURT:  You may have thought it was best for the

10   taxpayers to use money coming from the feds, but you could

11   have not done that and paid for it out of the cash on hand?

12           THE WITNESS:  That's correct.  We could have paid

13   for it with local money.

14   BY MR. LACY:

15   Q.  Speaking of funding, the DEQ actually used emergency

16   funds to fund the expert panel and its subsequent report,

17   correct?

18   A.  I don't know if they used emergency funds or not.

19   Q.  Of course, the general assembly set aside $2 million to

20   be used to deal with issues at the landfill in conjunction

21   with the issuance of the expert report, correct?

22   A.  Yes, and DEQ has not handed those funds over to us at

23   this time.

24           THE COURT:  Why not?

25           THE WITNESS:  That's a question for DEQ, Your Honor.

1    I don't know.  I believe, as this Court knows, we do have

2    some notices of violations that are still pending, and I

3    think certain things will be wrapped up within a consent

4    order at some point in the future.

5    BY MR. LACY:

6    Q.  Have you asked DEQ can I have the $2 million?

7    A.  Yes.

8    Q.  And have they responded?

9    A.  They advised me that they would work through that with a

10   consent order.

11   Q.  By "consent order" you mean an order that requires

12   Bristol, Virginia, to comply with the requirements of the

13   expert panel report, correct?

14   A.  That's correct.

15   Q.  Now, after -- you recall when Bristol, Tennessee, issued

16   its notice of intent to sue Bristol, Virginia, correct?

17   A.  Yes.

18   Q.  And in your response to that notice, Bristol, Virginia,

19   did not truck in any additional cover to meet its cover

20   requirements at the landfill, correct?

21   A.  We had been placing cover on the landfill.  Whether or

22   not it meets the intermediate cover requirement, I couldn't

23   tell you, but we've been placing cover on the landfill for an

24   extended period of time.

25   Q.  So you can't testify here today that you took any action

1   after receiving that notice of intent to sue to actually

2   comply with the regulations that govern the landfill as it

3   relates to cover, right?

4   A.   I know my staff was placing cover on the landfill.

5   Q.   Okay.  You just don't know whether it was enough?

6   A.   That's correct.

7   Q.   All right.  But you do know that on April 5, 2022, after

8   receiving the notice of intent to sue, DEQ issued a notice of

9   violation to Bristol, Virginia, for failing to have adequate

10  cover?

11  A.   Yes.

12  Q.   So I think that closes the loop, right?  You'd agree with

13  me that that shows that after receiving the notice of intent

14  to sue, Bristol, Virginia, still wasn't in compliance with

15  its cover requirements, right?

16  A.   I would agree with DEQ's assessment.

17  Q.   Thank you.  Do you have any reason to doubt that the

18  cover requirements required by the preliminary injunction

19  order could have been satisfied in 45 days?

20  A.   Based on what I know and based on what my staff has done,

21  I don't think it could have been done in 45 days.

22  Q.   Okay.  One moment, Your Honor.

23        Mr. Eads, as you know, both the expert panel report

24  and this Court's preliminary injunction order require closure

25  of the landfill, correct?

Randall Eads - Cross-Examination                              79

1   A.  I think there is some determination as to whether or not

2   it should be permanently closed or not.  I don't think the

3   expert panel report says permanently closed, from my

4   recollection.

5   Q.  All right.

6   A.  But I'll tell the Court here today, and I'll tell you

7   today, I do not think that landfill will ever be operational

8   again after September 9th.

9   Q.  How about this:  Is it Bristol, Virginia's intention to

10  permanently close the landfill?

11  A.  I think what we have to do is talk to our experts and

12  move through that process and get a permanent closure plan in

13  place with DEQ before we can make that determination because

14  they have to approve permanent closure.

15  Q.  I understand that DEQ has to approve permanent closure.

16  What I'm asking you is:  Is it the intention of Bristol,

17  Virginia, to permanently close that landfill?

18  A.  It's my intention as long as I'm city manager that there

19  will never be another piece of trash put in that landfill.

20  Q.  After September 9th?

21  A.  After September 9th.

22          MR. LACY:  I have nothing further, Your Honor.

23          THE COURT:  All right.  Any further questions?

24          MS. ASHWELL:  No, Your Honor.  Thank you.  Thank

25  you, Mr. Eads.

Michael Williams - Direct Examination                          80

```
 1              THE COURT:  Thank you, Mr. Eads.

 2              THE WITNESS:  Thank you, Your Honor.

 3              THE COURT:  You may step down.  Now, is there any

 4     evidence to be presented, Mr. Lacy, by your client?

 5              MR. LACY:  Your Honor, if I may call Michael

 6     Williams to the stand.

 7              THE COURT:  All right.  Mr. Williams, please come

 8     forward and be sworn, please.

 9              MICHAEL WILLIAMS, called by the plaintiff, having

10     been first duly sworn, was examined and testified as follows:

11                        DIRECT EXAMINATION

12     BY MR. LACY:

13     Q.  Mr. Williams, can you state your full name for the

14     record?

15     A.  My name is Michael Williams.  I'm a professional

16     geologist.

17     Q.  If you could, take it slow, speak into the microphone,

18     and we'll get through this.

19              Mr. Williams, are you currently employed?

20     A.  I am.  I'm employed by Golder Associates United States of

21     America, Inc.

22              THE COURT:  Actually, if you move back from the

23     microphone, it won't pop.

24              THE WITNESS:  Okay.

25     BY MR. LACY:
```

Cynthia L. Bragg, Official Court Reporter

Michael Williams - Direct Examination                          81

1   Q.   What does Golder & Associates do?
2   A.   We're environmental consultants, mining consultants.  My
3   particular business is focused on landfills.
4   Q.   Okay.  How long have you worked for Golder?
5   A.   I've worked for Golder since 2004.
6   Q.   Okay.  You mentioned, I believer, earlier that you're a
7   certified professional geologist?
8   A.   That's correct.
9   Q.   And how many years of experience do you have in the solid
10  waste industry?
11  A.   A little over 30.
12  Q.   How much of your daily duties relate to assisting clients
13  on landfill matters?
14  A.   Probably around 90, 95 percent on solid waste facilities.
15  Q.   When you say solid waste facilities, is that the
16  professional term for a landfill?
17  A.   I'm sorry.  Yeah, that would be landfills for the most
18  part.
19  Q.   All right.  Now, you're familiar with Bristol, Virginia's
20  landfill, correct?
21  A.   That's correct.
22  Q.   When did you first learn of the Bristol, Virginia,
23  landfill?
24  A.   Probably four or five years ago.
25  Q.   Okay.  More recently -- well, let me ask you this:  Were

1    you a member of the expert panel?

2    A.   I was.

3    Q.   Tell me how you got onto the expert panel.

4    A.   I received an invite by email to come to Bristol,

5    Virginia, and participate on the panel.  I accepted that

6    invite, and I was here with about ten of my colleagues from

7    across the world back in March of '22.

8    Q.   What expertise did you bring to the panel that the other

9    panelists did not have?

10   A.   I believe I was the only geologist on the panel.  All the

11   other panelists, I believe, were professional engineers.

12   Q.   Why was it important to have a geologist on the panel?

13   A.   The significance is the quarry.  It's a geologic quarry

14   that was mined for limestone.  There's some water issues

15   there with groundwater coming in.

16          The water issue is a big part of the problem we have

17   today, so I think having a geologist there provided a

18   different insight to the issues that we were trying to

19   address at the panel.

20   Q.   Now, as part of your work on the expert panel, did you

21   visit the landfill?

22   A.   We did.

23   Q.   When did you visit the landfill?

24   A.   We visited the landfill, I think it was on March 21st,

25   2022.

1  Q.  All right.  Did you participate in the drafting of the

2  expert panel report that was published on April 25, 2022?

3  A.  I did.

4  Q.  And in that report the panel made recommendations as to

5  what Bristol, Virginia, should do to deal with the odor

6  issues, correct?

7  A.  That's correct.

8  Q.  Did it identify immediate action items that the panel

9  believed should be taken by Bristol, Virginia?

10  A.  I believe if you look at the executive summary, it kind

11  of lists out in order of importance, if you will, and the

12  first five -- three of the first five are focused on landfill

13  gas related issues.  The reason for that is because landfill

14  gas is the source of the majority of those odors that are

15  emitting from the landfill.

16        The other two, which were setting up settlement

17  plates and the thermocouples, those were focused on gathering

18  data on the landfill, how the waste mass is reacting to the

19  elevated temperature of the landfill reaction so that the

20  closure of that landfill could be designed to account for

21  those settlement things.

22        The three gas ones were eliminate the fugitive

23  emissions from the surface area, so that was the intermediate

24  cover aspect.  There is a perimeter gas collection control

25  system design that needs to be done.  Then the third one was

1  the operation of the gas collection control system.  They

2  needed to improve that operation.

3  Q.  I want to spend a moment on the cover requirement.  The

4  judge has asked some questions of counsel and a prior witness

5  about the significance of the cover as it relates to the

6  odors coming from the landfill.

7          Can you describe to the Court why complying with the

8  intermediate cover regulations would assist with dealing with

9  the odor?

10 A.  So the intermediate cover -- well, a couple of things

11 here.  You have daily cover that's supposed to be six inches,

12 or you can use an alternate daily cover that's approved by

13 DEQ.

14          The primary purpose of that is vector control.  You

15 place that over the trash.  It keeps the liter from blowing.

16 It keep the vultures and the bugs and things like that away.

17 It also helps shed storm water.  You don't want the storm

18 water when it rains going into the waste mass because that

19 creates more leachate.

20          The Bristol quarry is unique in that all the water

21 that falls within the quarry essentially has to be treated as

22 leachate if it comes in contact with the waste.  So that's

23 the daily cover part.

24          After you've done -- you're supposed to put daily

25 cover down, unless you have an approval from DEQ, every day.

1    Then the intermediate cover comes in after a certain time

2    frame of not putting in an area of the landfill.  You have to

3    come back in and put -- you have to have 12 inches of clean

4    soil.  Some people are able to use that daily cover for six

5    of it and add six more inches on top for a total of 12.

6            The thing to keep in mind is when you put that

7    intermediate cover down, you're ready at that point to put a

8    liner on top.  So it needs to be clean soil.  You don't want

9    trash sticking up through it.  At that point you're ready to

10   put a piece of plastic on top of that that's going to be

11   there for however long it's going to be there.

12   Q.  When you say soil, you just mean dirt, right?

13   A.  Yeah.  The intermediate cover doesn't need to be clay.

14   Ideally, depending on your situation, you don't want to use

15   highly erodible soil, but it doesn't need to be clay.  It

16   doesn't need to meet any kind of specifications.

17   Q.  When the liner is placed on top, that too would help

18   mitigate the odor coming from the landfill, correct?

19   A.  That's correct.  So the soil will help shed the water,

20   keep the storm water out, and it would help keep the gases

21   in.

22           Critically important -- I didn't mention this -- the

23   gas collection system that's being operated on this landfill

24   to keep the gas from escaping, so as you operate, you're

25   pulling a vacuum on those wells, and if you don't have

 1   sufficient cover what happens is you pull oxygen into the

 2   waste mass.

 3          When we do that, it's detrimental on a number of

 4   fronts.  It can cause landfill fires, which we can see in

 5   places.  Then you also kill your anaerobic bacteria.  There's

 6   a lot of biology that goes on in landfills to create the

 7   methane.  The anaerobic bacteria is super important, and they

 8   don't like oxygen.

 9   Q.  Let's spend a couple of minutes talking about the

10   thermocouples and how the installation of thermocouples would

11   help deal with the odor issues at the landfill.

12   A.  So I guess the thermocouples themselves are not going to

13   really help deal with the odor issues.  What their purpose

14   was is to gather data on the elevated temperature condition

15   within the waste mass vertically and horizontally throughout

16   the waste mass.  It's super important to understand that

17   because we need to understand how that elevated temperature

18   reaction is migrating within the waste mass.

19          The engineers need that information so that they can

20   then design a closure system that could handle that condition

21   that they're expecting to occur.  That in itself would help

22   control the odors.

23   Q.  Why did the expert panel report recommend that the

24   installation of the thermocouples occur immediately?

25   A.  The sooner we can get that data, the better.  We can't

1    proceed -- I don't believe that the engineers can proceed

2    with a design that's going to meet the long term needs for

3    that facility without that kind of information, so the sooner

4    we start gathering it, the sooner we can move towards the

5    next phase.

6    Q.  Let's fast forward a little bit.  You were involved in

7    the negotiation of the deadlines that are memorialized in the

8    preliminary injunction order, correct?

9    A.  That's correct.  I was involved in those phone calls.

10   Q.  Who else was on those phone calls, if you can recall?

11   A.  Yourself, for example, other attorneys that are in the

12   room, Ron DiFrancesco, I believe Bob Dick, who is not here.

13   Bob Dick is with SCS.

14   Q.  And SCS is Bristol, Virginia's engineering consultant?

15   A.  That's my current understanding.

16   Q.  Okay.  Is it your understanding that the deadlines --

17   well, let's talk about the deadline to apply the intermediate

18   cover.

19          The preliminary injunction requires that

20   intermediate cover be satisfied within 90 days of entry of

21   the order.  Do you think Bristol, Virginia, could have or

22   still can satisfy that intermediate cover requirement within

23   90 days of entry of the order?

24   A.  I do.  I had a number of conversations with my colleagues

25   at work, professional engineers and other geologists.  We

1    have a lot of experience with landfills.

2           We're looking at about an 18-acre landfill right

3    now, the exposed surface.  We assume that we need one foot of

4    soil over the entire thing.  That works out to about 43,000

5    tons if we use 1.5 tons per cubic yard.

6           We believe, having been involved in similar

7    projects, that that kind of material could be imported and

8    spread within about 30 to 45 days if you had good dry

9    conditions, and, you know, you work through the weekends,

10   that kind of thing.

11          I would say this, that the amount of truck traffic

12   right now -- I believe that right now the average tons

13   they're bringing in are about ten tons per truck.  I don't

14   think you would need to bring in more than that truck wise.

15   You just need bigger trucks that can bring in 20 tons of soil

16   at a time.  Then doing that they could get a thousand tons a

17   day which would allow them to cover that facility within

18   about 43 days.

19   Q.  So if I understand your testimony, you think it would

20   take approximately 43 days of delivering the same number of

21   trucks to the landfill to satisfy the cover requirement?

22   A.  Yeah, 43 working days.

23   Q.  And you mentioned bigger trucks.  I think you said 20

24   ton?

25   A.  Yes.

```
 1   Q.  In your experience of 30 years working in the waste

 2   management industry, is it common for operators of landfills

 3   to use this 20-ton truck to deliver cover?

 4   A.  Most of your private companies that I do work for, even

 5   the publics like Prince William County, they will use a

 6   bigger truck like that because they hire a contractor to do

 7   that kind of work.

 8   Q.  Was it your expectation that Bristol, Virginia, would

 9   hire a contractor to meet this cover requirement set forth in

10   the preliminary injunction order?

11   A.  I guess I really can't speak -- I mean, I would have

12   thought they would have.  If I were the manager for the

13   landfill, I would have said we need to bring in a third party

14   for this, but I wasn't the decision maker.

15   Q.  Now, on July 27, 2022, you participated in another phone

16   call with Bristol, Virginia, and its engineering consultants,

17   correct?

18   A.  That's correct.

19   Q.  On that call, did the engineering consultant for Bristol,

20   Virginia, make any representations as to the status of

21   Bristol, Virginia, satisfying the cover requirements?

22   A.  I don't believe it was the engineer.  I think it was the

23   city manager that made that statement.

24   Q.  The city manager, Mr. Eads?

25   A.  That's correct.
```

1    Q.  What was the statement that Mr. Eads made?

2    A.  I believe he -- don't quote me on this, but something

3    along the lines of "we're almost done."

4    Q.  Okay.  Now, did you recently take another site visit out

5    to the landfill?

6    A.  I did.

7    Q.  And when was that?

8    A.  That was on Tuesday, August 23rd, I believe.

9    Q.  So a couple days ago?

10   A.  Yes.

11   Q.  And what was the purpose of your site visit?

12   A.  I was asked to go out and assess the soil cover that's

13   been placed on the landfill for thickness to see if it

14   complied with the intermediate cover requirements.

15   Q.  Required by the preliminary injunction order?

16   A.  Yes.

17   Q.  When you did your site visit, can you describe to the

18   judge how the cover situation looked on August 23rd compared

19   to when you did the site visit back in March?

20   A.  So I was shocked.  When I arrived at the site, I was

21   expecting to see a lot of fresh dirt that had been pushed,

22   based on our conversation from the earlier call that the

23   facility was almost all covered.  So I was expecting to see a

24   lot of fresh dirt maybe with some hydroseeding on it to get

25   vegetation started.

1          When I arrived on site, the site essentially doesn't
2    look a lot different, in my opinion, from what it looked like
3    back in March.  The major changes that I saw, the working
4    face is much higher now in that area because they've been
5    putting trash in there, so it's built up a little height now.
6          Then the other major change I saw was the soil
7    stockpile area right there by the entrance which covered, I
8    think, about an acre in size.  I didn't measure it, but it
9    looks like about an acre in size of soil that's been
10   imported.
11         The rest of the landfill looks -- again, having been
12   there back in March and having a five or six month window
13   there, but it looked very similar to me.
14   Q.  So in other words, it didn't appear that they had placed
15   nearly the amount of cover necessary to meet this
16   requirement?
17   A.  That's correct.
18   Q.  Now, while you were on the site visit a couple of days
19   ago, you took some soil boring samples, correct?
20   A.  That's correct.
21   Q.  How many?
22   A.  I did 21 locations, somewhere between 21 and probably
23   about 30 borings.
24   Q.  Where in relation to the landfill were these borings
25   taken?

1   A.  Originally I was thinking I was going to target the areas

2   that had fresh dirt on them to demonstrate that they were

3   pushing a sufficient amount of soil in place.

4          When I arrived at the site, after seeing it and

5   realizing that they really weren't doing what I envisioned

6   they would be doing, I called my engineer, Ron DiFrancesco,

7   back at the office, and I asked about this.

8          His suggestion was that we get representative sample

9   locations within all the areas of the quarry.  Originally I

10  was thinking about doing six locations, but based on our

11  observations, we ended up doing 21.

12  Q.  Throughout the landfill?

13  A.  Across the entire landfill, that's correct.

14  Q.  Can you briefly describe what goes into making that soil

15  boring?

16  A.  What I brought out is what's called a hand auger, which

17  is a drilling device.  It's a two-and-a-half inch diameter

18  type hand auger.  It has a small bucket on the bottom with a

19  drill bit on it and a rod that extends up with a T-handle on

20  it.  We turn that into the ground to pull soil out of the

21  hole.

22          So what I did was -- I wasn't too concerned about

23  the type of soil.  I just wanted to see how thick the soil

24  was.  So I hand augered in until I got into trash.  In most

25  cases the trash I got into were rope, plastic fabric, and in

1    some cases some black debris.  Once I did that, I measured

2    the depth of the hole using a tape measure.

3    Q.  Of the 21 soil boring locations, how many met the

4    intermediate cover requirement?

5    A.  I believe it was five of the 21 locations had 12 inches

6    or more of soil.

7    Q.  Okay.  Now, in terms of the entire landfill, how much of

8    the landfill on a percentage basis do you believe, based on

9    your site visit of two days ago, meets the intermediate cover

10   requirement?

11   A.  Assuming that the samples I collected are representative

12   of the entire area, I'm going to say 25 percent of the

13   landfill currently meets the intermediate cover requirement.

14   Q.  How many acres of the landfill have been covered to date

15   based on your site visit two days ago?

16   A.  My best estimate without doing any measurements was about

17   two acres.  They had a nice drone photo that they used in

18   their presentation, and if you saw the area of red dirt

19   around the entrance, that area is pretty good.  In fact, I

20   would say that area met the requirements.  Then there were

21   some other areas on I believe the southwest side that met the

22   12 inches as well.

23   Q.  Okay.  How many acres is the landfill?

24   A.  We estimated the acres of the footprint of the landfill

25   where it is right now at about 18.4 acres or so.

Michael Williams - Direct Examination                    94

1   Q.  So in other words, your testimony, based on your site
2   visit, is only two of the 18 acres looks to have the
3   sufficient amount of intermediate cover; is that right?
4   A.  Correct.  That doesn't necessarily jive with the 25
5   percent.  The 25 percent is 25 of the 21 holes.
6   Q.  Understood.  I want to talk to you about Mr. Eads's
7   testimony about the bottlenecking at the landfill in terms of
8   the ability to run more trucks.
9         I believe your testimony earlier was if they ran
10  bigger trucks, they would be able to satisfy the cover
11  requirements in 45 days with the same amount of trucks
12  running?
13  A.  That's my best guess here.  They're bringing on average I
14  think about -- the spreadsheet they provided I believe showed
15  about an average of 50 trucks a day.  The average ton per
16  truck looked like it was just over 10 tons per truck.  I
17  noticed when I was out there they were running smaller trucks
18  and bigger trucks.
19  Q.  So if Bristol, Virginia, had used the larger 20-ton
20  trucks that is industry standard, if you will, there is no
21  bottlenecking problem in terms of meeting --
22  A.  I don't think so.  I think they could have run the same
23  number of trucks and brought in twice the soil.
24  Q.  Let's assume they -- well, based on your knowledge of the
25  waste management industry, are 20-ton trucks available to be

1    hired?

2    A.   I don't know about this geographic area, but usually yes.

3    Q.   To the best of your knowledge, are you familiar with any

4    efforts by Bristol, Virginia, to go out and hire any

5    contractor with 20-ton trucks?

6    A.   I'm not, and I think I heard the city manager indicate

7    that they decided to self-perform that work.

8    Q.   Okay.  Let's assume they didn't use 20-ton trucks.  Based

9    on your inspection, is there the bottleneck problem that they

10   are referring to?

11   A.   Not if they're running the same number of trucks.

12   They're obviously able to handle 50 trucks a day on top of

13   their trash trucks, so bigger trucks is not -- and some of

14   those trucks they're currently running are probably in that

15   range of 80,000 pound trucks that can haul 20 tons.

16   Q.   Okay.  Let's turn to the thermocouples.  Have you done

17   any independent research on the availability of the materials

18   necessary to install the thermocouples?

19   A.   I did.

20   Q.   Can you describe for the Court what you've done and what

21   your results were?

22   A.   So when we saw the request for an extension, we said,

23   "Wow, why do they need an extension?"  I called some driller

24   friends of mine that I've used, a company called M & W

25   Drilling, which as soon as I picked up the phone, he was

1    livid.

2           I said, "Whoa, what's going on?"  He apparently --

3    at that point he told me he had submitted a bid and that it

4    had been rejected.  I said, "Oh, I didn't know that.  What

5    can you tell me about that?"  He said, "We submitted a bid,

6    and it was rejected."  That's kind of where he left it.

7           One of the issues that then came out from the bid

8    when we got a hold of it was that they had a delay on the

9    equipment, certain materials, the piping and the actual

10   thermocouples or the thermistors.

11          So I started making some inquiries to find out can

12   we get the piping.  I reached out to a couple manufacturers,

13   and we can get those materials.  They're not things you're

14   going to go to a Home Depot and buy off the shelf.  These are

15   specialty materials, but about four weeks on the pipe.  They

16   need about 2,000 feet of stainless steel pipe, and there's

17   about four weeks delivery on that.

18          The thermistors I called -- RFP recommended a

19   certain brand.  Gorder Associates uses that brand of

20   thermistors for ice roads up in Alaska, so I was familiar

21   with the company.  I called them, and they explained that,

22   yeah, this is a busy time of year for them, but they needed

23   somewhere in the six to seven week range to provide the

24   materials.

25   Q.  Okay.  Now, when you say the pipes, is that another way

1   of saying the steel casings that the --

2   A.  That would go in the ground.

3   Q.  Okay.  And you're saying the thermistor.  Can you spell

4   that for the court reporter?

5   A.  I think it's T-H-E-R-M-I-S-T-O-R.  Do I get a prize?

6   Q.  Now, have you assisted other clients with time sensitive

7   projects like the one at issue here?

8   A.  We do all the time.

9   Q.  And what are some of the strategies you employ for those

10  clients to make sure that the activity is done as quickly as

11  possible or to meet whatever deadline is in play?

12  A.  Typically we'll look at a project from the design

13  engineer and say, okay, again, these are not things we can go

14  to Home Depot or Lowe's and get.  We've got to order these in

15  advance.

16          We usually will get or client to order these

17  materials in advance.  That way when they put the bid out,

18  they can go through the bid process; they can get an award;

19  and they can get a contractor under a contract.

20          Then the contractors usually have a mobilization

21  requirement.  You know, it could be 30 days; it could be 60

22  days.  So by the time you get somebody on site, you hopefully

23  have the materials you need for them to do the work.

24  Q.  So in other words, what you've done to accelerate the

25  process is have the customer or client -- in this case it

 1   would be Bristol, Virginia -- acquire the raw materials while

 2   the bidding process is going on?

 3   A.  That would be a strategy that I believe would work here.

 4   Q.  And then once a bidder is selected, the bidder comes on

 5   to the landfill, and the materials are ready for the bidder

 6   to do the work?

 7   A.  That's correct.

 8   Q.  Had that process been followed here, do you think

 9   Bristol, Virginia, would have been in a position to meet the

10   90 day deadline set forth in the preliminary injunction

11   order?

12   A.  I do believe so.

13           MR. LACY:  That's all I have, Your Honor.

14           THE COURT:  I'm not sure I understood your testimony

15   about the equipment necessary for the thermocouples.  Did we

16   talk about the thermocouples themselves?  Have you talked

17   about that?

18           THE WITNESS:  Yeah.  So we call them thermocouples

19   in the industry, but there are two different types of

20   devices.

21           A thermocouple is two metals or bimetal, and it's

22   actually a thermometer like your thermometer at home.  The

23   thermistors is a different instrument.

24           The bid document that the city put out said they

25   wanted to use thermistors.  We're calling them thermocouples

```
 1   because it's going to do the same thing.

 2           THE COURT:  So is that the six to seven week range

 3   that you're talking about?

 4           THE WITNESS:  That's what the contractor -- the

 5   manufacturer of the type that they want to use, that's what

 6   that gentleman told me.

 7           THE COURT:  All right.  Thank you.

 8           MR. LACY:  One follow-up question, Your Honor.

 9   BY MR. LACY:

10   Q.  Are there other types of thermistors or thermocouples

11   that you can use?

12   A.  Absolutely.  There are a number of manufactures for both.

13   Q.  Did you check with any other manufacturer of any other

14   type to see the lead time for that?

15   A.  I mean, I just did a quick search online for

16   thermocouples.  Omega, which is a big company, they make lots

17   of thermocouples, and they're three meters long.  They could

18   be used for the same purpose that we're trying to do here.

19           I don't know why, but the engineer for the city has

20   recommended this thermistor design, which is fine, but that's

21   the same -- what we're trying to accomplish here could be

22   done with other equipment is what I'm saying.

23   Q.  How long would it take to get the thermistor from Omega,

24   the other manufacturer you researched?

25   A.  I checked one website, and they had 18 that they could
```

1    ship tomorrow.

2          MR. LACY:  Okay.  No further questions, Your Honor.

3          THE COURT:  All right.  I have a few questions for

4    you here.  I have the expert report in front of me.

5          THE WITNESS:  Okay.

6          THE COURT:  I don't see anywhere in there that a

7    recommendation was made about the intermediate cover

8    requirement.

9          THE WITNESS:  That's correct.  One of the

10   recommendations is the -- I don't have it in front of me, but

11   it says something about control the fugitive emissions.

12         THE COURT:  That's right.  One of the findings is

13   that, "Air intrusion caused by insufficient daily cover use

14   and operation of the landfill gas collection system appears

15   to be resulting in nonideal concentrations of oxygen in the

16   waste mass," and you talked about that earlier.

17         THE WITNESS:  Yeah.

18         THE COURT:  Is that where the intermediate cover

19   requirement came from?

20         THE WITNESS:  That's correct.  When we were out

21   there in March, there was evidence that the city had been

22   using what's calling an alternate daily cover.  It looked

23   like what we call Posi-Shell, P-O-S-I S-H-E-L-L.  It's a

24   spray on material used to keep the liter down and keep the

25   vestors out.  What it doesn't do very well, though, is keep

Michael Williams - Cross-Examination                              101

1    the odors in and keep the oxygen out.

2          I don't know if they were still using it in March or

3    not, but there was a lot of evidence that that had been used.

4    So the recommendation was that they switch over to soil to

5    help shed that storm water, and the preliminary injunction

6    ended up with the intermediate cover requirement.

7          THE COURT:  All right.  Thank you.

8          MR. LACY:  Thank you, Your Honor.

9          THE COURT:  All right.  Any questions?

10                     CROSS-EXAMINATION

11   BY MS. ASHWELL:

12   Q.  Good evening at this point.  I'm Erin Ashwell, and I'm an

13   attorney for Bristol, Virginia.  I just have two questions.

14         Bristol, Virginia, consented to your visit to the

15   landfill and invited the visit at your counsel's request?

16   A.  I understand that's correct.  I did have permission, I

17   think.

18   Q.  Yes.  And even though 20,000 tons of dirt had been moved

19   since March, your testimony today is that you didn't see any

20   difference between the landfill in March and the landfill

21   when you visited on Tuesday of this week?

22   A.  I think what I said was I didn't see a significant

23   difference.  The landfill area where the filling is going on,

24   that was much higher in elevation because of all the

25   additional trash that's been brought in.

1          They were clearly using daily cover in that area

2     now.  When we were out there in March, that area was a lot of

3     exposed trash.  They were clearly bringing in daily cover for

4     that and covering that area with soil.

5          It was mixed with trash because the tracking of the

6     equipment on top of that is not ideal.  It does mix it with

7     the trash, and it comes up until unfortunately -- I'm not an

8     engineer, but the engineers I spoke to told me that that

9     material with the trash sticking up through the soil like

10    that would not be good enough for intermediate cover.  So

11    that's just one issue.  The other change I saw was the

12    stockpile area where the big pile of dirt was.

13    Q.  And you're not an engineer?

14    A.  I'm sorry?

15    Q.  You said you're not an engineer?

16    A.  I'm a geologist.  That's correct.

17    Q.  So you're not an engineer?

18    A.  I'm a scientist.  That's correct.

19          MS. ASHWELL:  Okay.  Thank you.

20          THE COURT:  All right.  Anything further?

21          MR. LACY:  No, Your Honor.

22          THE COURT:  Any further evidence?

23          MR. LACY:  Not on behalf of the plaintiff, Your

24    Honor.

25          MS. ASHWELL:  Your Honor, we would just briefly like

1    to be heard, and I will be brief because I realize it's late

2    in the day.

3            THE COURT:  You don't have any further evidence?

4            MS. ASHWELL:  No further evidence, Your Honor.

5            THE COURT:  All right.  I'll be glad to hear from

6    you and then from the other side.

7            MS. ASHWELL:  Your Honor, the City of Bristol,

8    Virginia, has testified that it takes this Court's order

9    incredibly seriously, which is why we've come to you well in

10   advance of the deadline when the city has had the realization

11   that it's not going to meet the deadlines in that order

12   because of factors outside of its control.

13           The remedy in an injunction is within your power to

14   recraft, and it should be recrafted where the city has shown

15   that it acted in good faith with alacrity, but it has

16   encountered unforeseen circumstances outside of its control

17   where it would otherwise have met the deadlines set forth by

18   the Court.

19           You've heard a lot from us today, so I'm going to

20   make really limited points.  On thermocouples, the but-for

21   cause of the city needing to come to you for more time is the

22   unexpected six to eight weeks delay on steel casing.  I

23   understand that Bristol, Tennessee, says that we didn't have

24   to go through procurement.  We think that the city had to.

25   We think the city was showing wisdom by going through that

1   process, but put that aside.

2           We understand that the city says, well, you

3   shouldn't have gone through a design process.  We disagree

4   with that.  We think having SCS, which was selected for its

5   expertise, and it has a specialty in gas monitoring, look at

6   this very difficult application in a moving environment, we

7   think that was wise, but put that aside.

8           When the city entered into the preliminary

9   injunction, its experts looked at lead times.  Pardon me.

10  When it put out the bid, it looked at lead times for the

11  equipment it was requesting.  It was not aware of the six to

12  eight week delay, and it is that unexpected six to eight week

13  delay which meant that bidders couldn't meet the deadlines

14  that has brought us here today.

15          That was unavoidable, and it's information that was

16  not available to the city when it entered into the

17  preliminary injunction, and it's a reason that the Court

18  should give us more time to get the thermocouples into the

19  ground.

20          With regard to cover, the city immediately jumped

21  into action.  It had been putting cover down before, but the

22  City of Bristol, Tennessee, asked in the preliminary

23  injunction that Virginia agree to put down a foot, and so

24  Virginia said it would.

25          It had the equipment to do it, it had the expertise,

 1   and it knows the difficult working conditions of the landfill

 2   because it's Bristol, Virginia's landfill.  It knows there is

 3   one entrance, one exit, one good road, and lately, Your

 4   Honor, a lot of mud.

 5           I understand Bristol, Tennessee's position to be

 6   that this could have been done in 45 days.  Your Honor, if

 7   you look at our calendar of rain -- pardon me, 43 days --

 8   there are not 43 working days between when Bristol, Virginia,

 9   entered into the preliminary injunction and the Court's

10   deadline.

11           I also understand Bristol, Tennessee, to concede

12   that you need dry conditions to put down cover.  Their expert

13   agreed that dry conditions are necessary.

14           Hindsight is 20/20.  If we had known that there

15   would be 20 days of rain, and, look, it may rain tomorrow,

16   then maybe other choices could have been made, but at the

17   point at which the city realized it had a problem, it did the

18   responsible thing.  It went to the other side, it opened up

19   the site for inspection, and, Your Honor, it came to you.

20           The delay that we're asking for is short in the

21   scheme of this problem.  We're asking for an additional four

22   weeks.

23           THE COURT:  The City of Bristol, Tennessee's

24   evidence from Mr. Williams, if I accept it, might raise the

25   inference that while there is no bad faith involved, that

1    perhaps better decisions should have been made early on, like

2    getting bigger trucks, for example, or, you know, there is a

3    concern about whether they went to the right suppliers for

4    the thermocouples and the piping and handled that in a

5    particular way.  If I accept that, does that reflect upon

6    your request at all?

7            MS. ASHWELL:  First, Your Honor, we disagree with

8    the factual ascertains.  We are not familiar with the

9    equipment that Bristol, Tennessee, says is available.  We do

10   not believe that the custom built equipment can simply be

11   switched out.  We don't know what equipment he's referring

12   to.

13           I do wish that -- you know, all of the documents we

14   have out are public.  If someone had known that we're looking

15   for something that there is a delay on, I wish someone would

16   have let us know so that we could have adapted.

17           But, Your Honor, we went to the experts in this, and

18   there is no reason to disbelieve that the choices that were

19   made by Bristol, Virginia, in designing thermocouples were

20   not the best choices taking into account things like the fact

21   that this needs to stay in the ground for 30 years to account

22   for the closure of the landfill.

23           So Bristol, Virginia, has more information about the

24   needs of its landfill.  It used that information in selecting

25   the materials.  So with foreknowledge, right, knowing what

1   the state of the world would be in 90 days, yeah, maybe some

2   different decisions would be made, but in looking at an

3   injunction, Your Honor, you have to look at the decisions and

4   the facts at the time when the injunction was entered into.

5          Bristol, Virginia, had no reason to believe at that

6   time that there was going to be this kind of delay for steel

7   casings.  I'm also confused because the steel casings, Your

8   Honor, are what there is a four to eight week delay on, and I

9   don't think that's interchangeable with the equipment that

10  Bristol, Tennessee, was talking about.

11         On the cover, it is unforeseeable that you would

12  have 20 days of rain and a COVID outbreak among your

13  employees.  That's unforeseeable.  They have still moved a

14  tremendous amount of dirt.

15         We disagree with the characterization of Bristol,

16  Tennessee.  It appears that they've testified that there are

17  two acres of 17 covered yet that 25 percent of the landfill

18  is covered.  Those numbers are inconsistent.

19         20,000 tons of dirt have been brought in.  Mr. Eads

20  testified that he believes 30,000 are required.  So we

21  believe that we are much further along.

22         THE COURT:  I think his testimony, Mr. Williams's

23  testimony was 25 percent of the samplings met the

24  requirement.

25         MS. ASHWELL:  Okay.

Bristol, TN v. Bristol, VA - 1:22cv23 - 8/25/22                    108

1              THE COURT:  And he estimated that two acres had been

2      covered with the 12 inches.

3              MS. ASHWELL:  None of these are precise measures,

4      but, Your Honor, you saw the video.  You saw the amount of

5      fresh dirt that has been put down on that landfill.  You saw

6      the amount of exposed trash, and you saw the significant

7      coverage elsewhere.  So the city has engaged in best efforts.

8      They have acted with their experts on then available

9      information.

10              And, Your Honor, this is a changing situation, so we

11      did the responsible thing respecting the Court's order and we

12      came to you, and we request an additional four weeks for the

13      cover, and we request through mid March on the thermocouples.

14              THE COURT:  All right.  Thank you, ma'am.

15              MS. ASHWELL:  Thank you, Your Honor.

16              THE COURT:  Mr. Lacy.

17              MR. LACY:  Thank you, Your Honor.  Let me first

18      thank the Court for its patience today and its diligence in

19      reviewing the papers before this hearing.

20              I also want to think the Court for setting this

21      hearing so promptly because, frankly, on behalf of Bristol,

22      Tennessee, this is the type of prompt action that's been

23      missing in this whole situation.  Virginia DEQ hasn't acted

24      promptly.  I think the evidence is clear that Bristol,

25      Virginia, certainly isn't acting promptly, certainly not as

1    promptly as it could.

2          Now, as you know from our papers, why we're here in

3    court today, contrary to counsel's representation at the

4    beginning of the hearing, is not because Bristol, Tennessee,

5    is acting unreasonably.  It's because but for Bristol,

6    Tennessee's filing of this lawsuit, nothing would have been

7    done, nothing.

8          I think it's established Bristol, Virginia, didn't

9    do anything of any material significance in response to the

10   expert report.  They didn't do anything of material

11   significance in response to our notice of suit.  We submit to

12   the Court they haven't done much more in response to this

13   Court's preliminary injunction order.

14         Now, opposing counsel suggests there are unforeseen

15   circumstances as it relates to the cover that are preventing

16   it from meeting the deadline, and it cites the weather and

17   COVID.  But you heard from Mr. Eads, and Mr. Eads testified

18   plainly that there are always weather problems, and there are

19   always cover problems.  That's his own testimony.

20         These aren't unforeseen circumstances.  This is

21   life.  The Court knows.  It's lived in the area.  It rains,

22   it does, but they agreed to those deadlines, and now they

23   want to walk them back.

24         THE COURT:  Well, let me ask you about that.  So,

25   you know, assuming that I deny the request of Bristol,

1   Virginia, for extensions, it doesn't appear they would be

2   able to meet the deadlines.  I mean, that seems clear.

3          So, you know, what happens then?  So I hold them in

4   contempt and start imposing sanctions, you know, $1,000 a

5   day, $10,000 a day, whatever.  Is that going to solve

6   anything?  I mean, what's the long term process here?

7          MR. LACY:  Your Honor, I appreciate the Court's

8   question, and let me respond as follows:

9          One, I think it's pretty clear from the evidence

10  submitted in court, I don't think it's a given that they

11  can't meet the cover requirements.  As the Court recognized

12  in some of its statements and questions, this is a function

13  of just getting dirt up there.  Whether you run more trucks

14  or you run bigger trucks, there is more that can be done to

15  meet this cover requirement.

16         I'm not trying to quarrel with the Court, but I do

17  think there is time left.  There are more days in a week than

18  just Monday through Friday as well.

19         Secondly, I think monetary sanctions --

20         THE COURT:  Let me interrupt you, if I can.  From

21  Mr. Williams's testimony, as I understood it, he doesn't

22  think from his drilling, bore drillings, that they have

23  satisfied the requirement of cover now.  There may be dirt

24  down, but it's not enough.

25         MR. LACY:  To be clear, I think there is a lot of

1   dirt, in our estimation about 20,000 tons, to be put out

2   there.

3           THE COURT:  Right.

4           MR. LACY:  I guess what I'm saying is if you put

5   enough money and you put enough trucks, and we've -- they've

6   got plenty of money.  Let's be clear.  They've cried poor in

7   the press, but they can't do that anymore.  They have plenty

8   of money, so money and time and effort.

9           But let's suppose they can't meet either deadline,

10  Your Honor.  It is not Bristol, Tennessee's position to be

11  punitive in this litigation, but at the same time if it's

12  monetary sanctions from the Court that is going to be the

13  final lever that needs to be pulled to get Bristol, Virginia,

14  to act with the sense of urgency that, frankly, it should

15  have been acting with since this odor problem reared its head

16  two years ago, then we submit it needs to be done.

17          Alternatively, there is reporting requirements that

18  they could make to the Court so the Court can stay up to

19  speed.  But, again, monetary sanctions, while perhaps harsh,

20  nothing has worked thus far; DEQ notices of violations,

21  expert reports, notices of intent to sue, a consent order

22  that's in the works, this lawsuit, the Court's preliminary

23  injunction order.  I would submit to the Court that Bristol,

24  Tennessee, actually exercised incredible restraint waiting to

25  go file suit until it did.  So that's our view on that.

1          I would also suggest that Mr. Eads's testimony that

2     this situation isn't an emergency is beyond -- it's just --

3     it clearly is.  He's referred to this as a monumental

4     disaster.  I don't know how you can square his testimony

5     today with his prior statements that this is a monumental

6     disaster.

7          They did not need to go through the bidding process.

8     They could have sped this thing right up.  They could have

9     followed the strategies that Mr. Williams laid out, which are

10    not secret.  They're not trade secret.

11         By the way, if they're having trouble sourcing

12    materials, one thing they could have done, if they really

13    wanted to be collaborative with my client, they know we have

14    experts.  Pick up the phone and ask for help.  We're happy to

15    help.  We want this problem solved.  Now, of course, they can

16    get online just like we can, but --

17         THE COURT:  Well, getting to the bid process, you

18    know, even assuming I agree with you there that they could

19    have done away with that, I mean, the bid process does have

20    substantial protections for the public and the amount of

21    money that's going to be spent here.  I just throw that out

22    for thought.

23         MR. LACY:  Your Honor, I don't disagree with that,

24    but, unfortunately, Bristol, Virginia's inaction put them in

25    a situation where we believe those types of actions are

Bristol, TN v. Bristol, VA - 1:22cv23 - 8/25/22                113

1    simply off the table.

2           You entered a preliminary injunction order that they

3    negotiated and consented to.  You were very clear at the July

4    20 status conference about your enforcement of these

5    deadlines.  They are coming to you asking for extensions, and

6    I would submit to you, Your Honor, the evidence establishes

7    there was plenty more they could have done and should have

8    done to comply with this Court's order.

9           Unless the Court has any questions, I'll sit down.

10          THE COURT:  All right.  Thank you.

11          Any brief response, Ms. Ashwell?

12          MS. ASHWELL:  No, Your Honor.

13          THE COURT:  All right.  Well, thank you, counsel.

14   The bottom line is I'm going to take this under advisement.

15          It's an important issue for several reasons.  The

16   first reason, of course, is that the agreement of the parties

17   has been incorporated in an order of this Court, and I

18   obviously feel a particular responsibility to make sure that

19   Court orders are enforced.  Otherwise, the Court's power

20   would be substantially reduced.  I recognize that the Court

21   certainly has the power to change or amend its order, and

22   that's the issue that we have here.

23          The second reason, of course, is that this is an

24   important issue for the community in which the parties are

25   part of.  It's a concern that's been going on for some time.

Bristol, TN v. Bristol, VA - 1:22cv23 - 8/25/22

```
 1    I don't -- I live in Abingdon and, of course, have not been
 2    affected by the odor problem, but I certainly recognize
 3    because of a close geographical distance from the area that
 4    it's a major problem for both cities and their citizens.
 5            I've lived in this area many years, and I know how
 6    important the quality of life is to the residents of this
 7    area.  This is a problem that directly affects that quality
 8    of life.  It also has an economic disadvantage, I believe,
 9    perhaps to the area.  So the second reason, of course, for my
10    deep consideration of this issue is the public good involved.
11            I want to thank counsel for their presentations
12    today.  Obviously, I will rule as quickly as I can.
13            If there is nothing further, we'll recess court.
14            (Proceedings concluded at 5:17 p.m.)
15
16                          CERTIFICATION
17
18       I certify that the foregoing is a correct transcript
19    from the record of proceedings in the above-entitled matter.
20
21              _____/s/_____
22                      Cynthia L. Bragg
23                      September 13, 2022
24
25
```

Cynthia L. Bragg, Official Court Reporter